The **PENNSYLVANIA RAILROAD COMPANY**

v.

**UNITED STATES** of America and Interstate Commerce Commission, Appellants.

No. 14021.

United States Court of Appeals Third Circuit.

Argued Dec. 7, 1962.

Decided April 5, 1963.

Kathryn H. Baldwin, Dept. of Justice, Washington, D. C. (Joseph D. Guilfoyle, Acting Asst. Atty. Gen., Drew J. T. O'Keefe, U. S. Atty., Alan S. Rosenthal, Attorneys, Department of Justice, Washington, D. C., on the brief), for appellants.

William F. Zearfaus, Philadelphia, Pa. (Edward A. Kaier, Philadelphia, Pa., on the brief), for plaintiff-appellee.

Before BIGGS, Chief Judge, and STALEY, Circuit Judge, and LEAHY, District Judge.

BIGGS, Chief Judge.

The problem presented by the case at bar is a difficult one. On various dates in 1941 and 1942, 75 carloads of iron and steel articles were shipped via The Pennsylvania Railroad Company from various points in Ohio, West Virginia and Maryland to the Port of New York for export to the British Ministry of War Transportation. The shipments moved on "prepaid"[1] bills of lading which acknowledged that the lading was "Received * * * subject to the classifications and tariffs in effect on the date of the original bill of lading * * *." There is no question but that the tariffs, thus made part of the contracts of transportation, provided two sets of shipping rates to the Port of New York from the origins designated in the bills. One set of tariffs prescribed applicable domestic rates and the other set up rates applicable to export shipments. The export rates were substantially lower than the domestic rates.[2]

---

1. That the shipments were prepaid seems to be conceded by the parties.

2. The export rates, first established in 1903 at the request of manufacturers in

The tariffs applicable to the export rates provided that the export rates should apply only to shipments that were delivered by the carrier direct to the steamer or steamer's docks and which did not leave the possession of the carrier at the port to which they were consigned originally, prior to exportation.[3]

General Order O.D.T. 16, 7 F.R. 5194, issued on July 6, 1942, provided that shipments of iron and steel to ports for export could be made only after issuance by the Office of Defense Transportation of a permit called an "ODT block permit". Such a permit was to be granted covering a specified shipment only when definite cargo space at the designated port was available or assurances were received by the issuing officials that within a reasonable time after the arrival of the freight at that port, cargo space would become available. Shipping pa-

pers, such as bills of lading, were required to make reference to the ODT permit by number and the bills of lading covering 62 of the 75 carloads bore the notation "ODT block permit" with an appropriate number. Twelve of the carloads were shipped prior to the issuance of O.D.T. 16 and, of course, moved without block permits. One carload was shipped on a bill of lading which failed to show any ODT block permit.

When the 75 carloads reached the Port of New York, due to enemy submarine activity and other wartime causes [4] there was no cargo space available. The contents of the cars were unloaded and put in ground storage at Greenville or Manhattan piers, railroad storage yards with lighterage facilities. Later, if this fact be pertinent, the contents of the 75 cars were shipped by rail from the Port of New York to various destinations.[5]

---

the United States, were created voluntarily by the railroads of the United States to enable the manfacturers in this country to develop foreign trade in competition with European producers and manufacturers.

3. The specific tariff provision is as follows: "Rates named herein and designated as 'Export Rates' will apply only on traffic which does not leave the possession of the carrier delivered by the Atlantic Port Terminal carriers direct to the steamer or steamer's docks upon arrival at the port or after storage or transit has been accorded by the port carrier at the port under tariffs which permit the application of the export rates, and also on traffic delivered to the party entitled to receive it at the carriers' seaboard stations to which export rates apply which traffic is handled direct from carriers' stations to steamship docks and on which required proof of exportation is given."

4. Not clearly developed in the record.

5. There is confusion in the record on this point. The report of the Commissioner states, para. "8", in this connection: "Twenty-one of the shipments were subsequently exported by rail to the Metal Reserve Company, c/o Steel Company of Canada, Hamilton, Ontario. The United States Government did not pay the freight charges on this movement. All of the freight charges were paid by the Steel Company of Canada. The remain-

ing 54 shipments were transported by rail to other ports in the United States and were exported from such ports."

The Report of the Commission, Division 2, states, however, 305 I.C.C. 260–261: "Upon arrival at New York the shipments were unloaded and placed in ground storage at Greenville piers or Manhattan Piers, which are railroad storage yards with lighterage facilities. Owing to the activity of enemy submarines off the Atlantic coast and other conditions incident to the prosecution of the war, there was a lack of available shipping space, and the shipments could not be loaded aboard vessels at New York for overseas destinations. Subsequently, 21 of the shipments were forwarded by rail to Hamilton, Ontario, Canada. The remaining 54 shipments were later transported from New York by rail and exported from other ports. All were eventually exported from west coast ports, except two of the shipments which, respectively, moved through New Orleans, La., and Baltimore, Md. *The rail charges from New York on the shipments are not at issue here.*" (Emphasis added.)

The parties to the litigation apparently are in complete accord with the statement made in the italicized sentence quoted immediately above and have pitched their respective arguments on the issue of the propriety of the rates, domestic or foreign, to be charged by the Pennsylvania Railroad from the points of con-

We are concerned only with the charges from the points of origin to the Port of New York. When the shipments were not exported from the Port of New York, the Railroad submitted supplemental bills claiming the higher "domestic" rates. Pursuant to the provisions of Section 322 of the Transportation Act of 1940, 49 U. S.C. § 66, the charges were paid. But after audit, the Government Accounting Office disallowed the supplemental charges. On the Railroad's failure to. make refunds as requested, the additional charges were deducted from sums due the Railroad for other transportation services. The suit at bar was brought to recover the amounts of these deductions. The Railroad moved for summary judgment. The United States filed a cross-motion to the same effect. The court below decided in favor of the Railroad, 199 F. Supp. 586 (1961), and the appeal at bar followed.

Prior thereto, the issue as to what were the correct rates to be charged had come on for hearing before the Interstate Commerce Commission (Division 2), pursuant to the direction of the Supreme Court [6] and the Commission, after hearings, held, 305 I.C.C. 259 (1958), that charges based on the domestic rates on these carloads which did not have ODT block permits were just and reasonable, while charges based on the domestic rates on these carloads which had ODT block permits were not; i. e., that the Railroad was entitled to domestic rates on 13 carloads but was not entitled to domestic rates on 62 carloads.

The gist of the Commission's decision will be found, we believe, in the following paragraph: "The question of the proper charges on 'frustrated shipments,' such as those here considered, has been before this Commission for determination in a number or proceedings cited by the parties. In some cases, the charges at the domestic rates were found unjust and unreasonable, while in others the requests for relief were denied. In some of the cases cited, an award of reparation was unopposed by the carriers. The decision in each proceeding was made upon the facts and circumstances surrounding the specific movements. A prime factor for consideration in complaints involving shipments of 'frustrated freight' is whether vessel space was reserved prior to shipment. This tends to indicate whether or not due diligence was exhibited on the part of the shippers to avoid noncompliance with the provisions of the export tariff." See 305 I.C.C. p. 263.[7] The Commission seemed to treat the fact that ODT certificates were procured for the 62 carloads as creating an overriding "equity" which entitled the United States to the lower export rate.

In addition, the Commission pointed out that effective on December 28, 1942, after the shipments *sub judice* had moved, the Railroad had established a "frustrated freight tariff"[8] which would have been applicable to at least all but two of the shipments under consideration had the shipments been made on or after the date last mentioned.[9]

---

signment to the port of New York. Nothing in the record that we can find or that has been pointed out to us by the parties serves to enlighten us further.

6. See Pennsylvania R. Co. v. United States, 363 U.S. 202, 80 S.Ct. 1131, 4 L.Ed.2d 1165 (1960).

7. The United States did not seek to review the Commission's decision as to the allowance of domestic rates on the 13 carloads.

8. The rules created by this tariff provided that if the traffic, owing to the war emergency, were reshipped to another

port for export óver a route over which the through rate from the point of origin to the port through which the shipments actually were exported, did not apply, the export rate, to the port originally consigned, plus the export rate from that port to the port through which the shipments were actually exported, would apply. See 305 I.C.C. at p. 261.

9. Cited in the Report, 305 I.C.C. 259 et seq. is Pacific Chemical & Fertilizer Co. v. Pennsylvania R. Co., 268 I.C.C. 468 (1947), in which the Commission found, in the absence of a provision for application of export rates on carloads of sulphate of ammonia fertilizer from interior

The Railroad asserts that the Commission has in effect exacted reparations and that it may not do this under Arizona Grocery v. Atchison Ry., 284 U.S. 370, 52 S.Ct. 183, 76 L.Ed. 348 (1932), that all shipments in the 62 cars, save one shipment of steel ingots,[10] moved on the basis of rates "prescribed" by the Commission in Iron and Steel Articles, 155 I.C.C. 517 (1929), as increased by Commission "permissions"[11] and (to employ the Railroad's own descriptive terms), that the rates which the Commission has found applicable were substantially below the basic levels which the Commission had itself "prescribed". We think that the *prescribing* referred to by the Railroad in Iron and Steel Articles, supra, was to the domestic rates which the Commission did make applicable.[12] But the Railroad expressly con-

cedes that the effect of the *"Ex Parte* proceedings" was "permissive" only and that the Arizona Grocery decision cannot be employed as a basis for domestic rate "increases". The Commission says it is not exacting reparations but is relieving the shipper of an unjust rate. It is clear, however, that one of the conditions of the export tariff as filed by the Railroad was not fulfilled in order that the export rate could apply, i. e., the shipments did leave the possession of the Railroad at the Port of New York. See note 3, supra. The Railroad had to collect the rates the tariff called for and those were the domestic rates, the meaning of which had been determined by the Commission in Iron and Steel Articles. See Crancer v. Lowden, 315 U.S. 631, 635, 62 S.Ct. 763, 86 L.Ed. 1077 (1942): "Until changed, tariffs bind both carriers

points in the United States to Richmond, California, where the fertilizer was stored in a public warehouse and reforwarded to Oakland and San Francisco and then exported to the Hawaiian Islands, that domestic rates were not unreasonable and allowed them. In this case the Military Governor of the Hawaiian Islands had established a permit system substantially similar to the ODT permit system in the case at bar, and the Fertilizer Company had not taken adequate steps to assure itself that shipping would be available for its fertilizer. These factors furnished the basis for allowing the Railroad the domestic rate.

In its report in the case at bar the Commission referred *inter alia* to California Texas Oil Co. v. Bessemer & L. E. R. Co., 264 I.C.C. 147 (1945), and Division decisions in C. B. Fox v. Gulf M. & O. R. Co., 246 I.C.C. 561 (1941) (shipments were never exported), River Petroleum Corp. v. Yazoo & M. V. R. Co., 258 I.C.C. 1 (1944), and to Midcontinent Petroleum Corp. v. Illinois Central R. Co., 258 I.C.C. 422 (1944). The substantial basis of decision in the cited cases was that the shippers made no prior arrangement for cargo space and therefore had not exercised due diligence.

10. Not identified in the briefs or argument as to carloads. There seems to be a disagreement as to the relevant facts on this point. See 305 I.C.C. 265.

11. See Ex parte 115 (208 I.C.C. 4, 60 (1935)); Ex parte 123 (226 I.C.C. 41, 141 (1938)); and Ex parte 148 (248

I.C.C. 545, 612 (1942)). In each Report reference is made to Arizona Grocery v. Atchison Ry., 284 U.S. 370, 379, 52 S. Ct. 183, 76 L.Ed. 348 (1932), and it is conceded by all that the principle of that case will have no application to the rate increases granted.

12. The Railroad's argument is not clear to us. We think that the decision was cited by the Railroad in support of the domestic rate though a brief paragraph contained in the Report deals with "Export Rates". It is as follows: "Export Rates: Much evidence with respect to export rates was received. At the time of the hearings export rates to the north Atlantic ports were in effect generally on the basis of 75 per cent of the domestic rates. Subsequently the carriers filed schedules proposing to reduce the export rates to the basis of approximately 60 per cent of the domestic rates, and to increase the minimum weight in connection therewith from 36,000 pounds to 45,000 pounds. Various requests for the suspension of these schedules were filed, the principal protests coming from steel producers on or near the seaboard. After careful consideration we declined to suspend the schedules and they became effective December 31, 1927. The schedules were filed to expire on December 31, 1928, unless sooner canceled, changed, or extended. They have since been extended to December 31, 1929. In view of these facts export rates will not be further considered in this proceeding." 155 I.C.C. at p. 538.

and shippers with the force of law. Under § 6 of the Interstate Commerce Act the carrier cannot deviate from the rate specified in the tariff for any service * * *", citing Lowden v. Simonds-Shields-Lonsdale Grain Co., 306 U.S. 516, 520, 59 S.Ct. 612, 83 L.Ed. 953 (1939).

As we have said the Commission has expressly disclaimed reparations as the basis for refusing the Railroad recovery. It falls back on Standard Oil Co. of New Jersey v. Pittsburgh & L. E. R. Co., 259 I.C.C. 793, 797 (1945). As we read it, the cited case is one in which it was found that the "charges assailed, based upon the domestic rate . . ., were unjust and unreasonable . . ." under circumstances very similar to those at bar.

Section 1(5) of the Interstate Commerce Act, 49 U.S.C.A. § 1(5) provides that charges for transportation must be just and reasonable. The question of reasonableness is one of fact. Illinois Cent. Ry. Co. v. Interstate Commerce Commission, 206 U.S. 441, 27 S.Ct. 700, 51 L.Ed. 1128 (1907). There is authority to the effect that the status of the shipment of military stores by a common carrier should be determined at the time of the shipment, Sonken-Galamba Corp. v. Union Pacific R. Co., 145 F.2d 808, 812 (10 Cir., 1944), cited in Northern Pac. Ry. Co. v. United States, 101 F. Supp. 29, 31 (D.C.Minn.1951), and the shipments at bar were received as export shipments but subject to tariff conditions. But the issue of reasonableness of rates charged is one which Congress saw fit to entrust solely to the Commission, Union Pac. R. Co. v. United States, 111 F.Supp. 266, 125 Ct.Cls. 390 (1953), albeit, if the issue is one as to which of two rates shall apply that matter is also one for the courts. Great Northern Railway Co. v. Merchants Elevator Co., 259 U.S. 285, 42 S.Ct. 477, 66 L.Ed. 943 (1922). There can be no doubt that the Commission must rest its decisions on transportation policy. In the case at bar the Commission has stated the considerations that have moved its judgment though it has not expressly found that the export rate was reasonable, as in General Carloading Co. Inc. v. Baltimore & O. R. Co., 266 I.C.C. 243 (1946), or stated any succinct test, albeit almost a subjective one, as in Rogers v. Illinois Central R. Co., 311 I.C.C. 153 (1960).[13] The considerations stated by the Commission seem to us to be in support of the national transportation policy, albeit it has not directly said so. It appears to us that the Commission properly has weighed all pertinent factors, including some which the Railroad deems irrelevant. We may remark parenthetically that we do not find that the Commission's decision in respect to the 62 carloads was based on sympathy for the United States. What the Commission in fact has done, as it has in some of the other decisions, cited in this opinion, is to provide for just and reasonable charges on the 62 carloads with which we are concerned. Cf. United States v. Chesapeake & Ohio Rwy. Co., 352 U.S. 77, 80, 77 S.Ct. 172, 1 L.Ed.2d 140 (1956). The fact that the Commission has disclaimed the application of the reparations principle does not disturb us. The case at bar involves more than an exercise in semantics.

As indicated, we believe that the court below erred in its conclusions. What was stated in Crancer v. Lowden, supra, 315 U.S. at p. 635, 62 S.Ct. at p. 765, although in a somewhat different connotation is pertinent here. Mr. Justice Byrnes said: "The issue of the reasonableness of the rates was not open to the District Court." That issue is not open to this court either.

The order of the court below will be reversed and the case remanded with the direction to dismiss the petition for want of equity.

---

13. See 311 I.C.C. at p. 156: "We do not believe that the frustrated freight doctrine should be applied where, as here, the shipper had no reasonable grounds for believing that lawful exportation could be accomplished."