**F.P. CORP.**

v.

**KEN WAY TRANSPORTATION, INC., R.M. Palmer Company, and M. Polaner, Inc.**

**Civ. A. No. 91–5125.**

United States District Court, E.D. Pennsylvania.

April 8, 1993.

Dwight L. Koerber, Jr., of Kriner, Koerber & Kirk, Clearfield, PA, John T. Siegler, of Sims, Walker & Steinfeld, Washington, DC, for plaintiff.

Charles C. Thebaud, Jr., Paul Lamboley, of Newman & Holtzinger, Washington, DC, for defendants.

## MEMORANDUM

HUYETT, District Judge.

Plaintiff F.P. Corp. (FP) instituted this action pursuant to the Interstate Commerce Act (ICA), 49 U.S.C.A. § 10101 et seq. (West Supp.1992), against Defendants Ken Way Transportation, Inc. (Ken Way), R.M. Palmer

Company (Palmer), and M. Polaner, Inc. (Polaner) to recover undercharges for freight shipments. Defendants have filed a motion to stay the proceedings in this action and to refer certain issues to the Interstate Commerce Commission (ICC or Commission). For the reasons stated below, the Court will grant Defendants' motion to stay the proceedings in this action pending a decision of the ICC on Defendant Ken Way's petition for declaratory relief filed with the ICC on July 20, 1992.

## I. Background and Positions of the Parties

Plaintiff operated both as a motor common carrier and a motor contract carrier pursuant to the authority of the Interstate Commerce Commission. Defendant Ken Way is licensed and authorized by the ICC to act as a broker for interstate transportation of property and to receive compensation for its services. Defendants Palmer and Polaner are manufacturers and shippers of products and as shippers utilized the services of Ken Way to arrange for the transportation of goods in interstate commerce and were shipping customers in certain transportation transactions involving motor carriage by FP arranged by Ken Way. On May 24, 1988 FP and Ken Way executed a contract carrier agreement. From May 24, 1988 to June 11, 1990, Ken Way tendered goods to FP for transportation. FP billed, and Ken Way paid, the price agreed upon by the parties at the time of shipping. These prices were below the rates contained in the tariff that the Interstate Commerce Act requires the carrier to "publish and file" with the ICC. 49 U.S.C.A. § 10762. FP commenced this action against Defendants to recover undercharges, which represent the difference between FP's filed tariff rate for common carriage and the negotiated rate for contract carriage actually billed and paid. FP contends that it acted as a motor common carrier when it transported the freight tendered by Ken Way and is therefore entitled to the filed tariff rate under the filed rate doctrine.

Defendants raise several affirmative defenses to Plaintiff's amended complaint. Defendants assert that Plaintiff transported the goods as a motor contract carrier pursuant to a valid written contract carrier agreement, that Ken Way paid the amounts due pursuant to the contract, and that Plaintiff is not entitled to collect the filed tariff rate. Further, Defendants assert that even if Plaintiff was acting as a motor common carrier, the tariff rates are unreasonable and hence unenforceable. In addition, Defendants assert that Plaintiff does not officially participate in applicable tariffs necessary to support its tariff-based claims and that therefore its tariffs are void and unenforceable. Defendants further contend that Plaintiff incorrectly interprets the tariff rates and incorrectly applies the filed rate doctrine in this undercharge action. Defendants also assert that the defenses just described raise issues within the primary or exclusive jurisdiction of the Interstate Commerce Commission and that the Court should stay this action and let the ICC resolve these issues. Finally, Defendants make a counterclaim for misrepresentation. Defendants claim that Plaintiff misrepresented that it would perform the transportation services as a contract carrier rather than as a common carrier.

Plaintiff responds to Defendants' motion to stay by contending that the contract between it and Ken Way failed to meet the statutory and regulatory requirements of contract carriage, and thus the parties were bound by the filed tariff rate. Plaintiff asserts that the Court need not refer this issue to the ICC. Plaintiff also contends that Defendants' assertion that the filed rate is unreasonable does not provide a defense in an action at law to collect freight charges. Plaintiff instead claims that Ken Way must pay the filed rate and then seek relief in a separate action under the ICA. Finally, Plaintiff argues in the alternative that Defendant Ken Way have failed to proffer adequate evidence of rate unreasonableness to refer the issue to the ICC.

## II. Filed Rate Doctrine and Contract Carriage

■■■ The Interstate Commerce Act requires a carrier to publish and file tariffs containing the rates for transportation service it may provide in interstate commerce. 49 U.S.C.A. § 10762. The filed rate doctrine, as codified in section 10761(a), provides that

a carrier "may not charge or receive a different compensation for that transportation ... than the rates specified in the tariff." § 10761(a). The Supreme Court has strictly construed the doctrine. *See Maislin Industries, U.S. v. Primary Steel,* 497 U.S. 116, 126–28, 130, 110 S.Ct. 2759, 2765–66,. 2768, 111 L.Ed.2d 94 (1990). Deviation from the filed rate is not permitted under any circumstances and deviation can result in the imposition of civil or criminal sanctions. *See* §§ 11902–11904. Moreover, the Court has stated that a shipper's ignorance or a carrier's misquotation of the applicable rate is not permitted to serve as a defense to a common carrier's collection of the filed rate. *Maislin,* 497 U.S. at 120, 110 S.Ct. at 2762. Shippers are deemed to have constructive notice of the applicable rate. *Id.* at 127, 110 S.Ct. at 2766. In *Maislin,* the Court overturned the ICC's policy of relieving the shipper of the obligation to pay the filed rate when the shipper and the common carrier had negotiated a lower rate, holding that the policy was inconsistent with the provisions of the ICA. *Id.* at 119, 110 S.Ct. at 2762.

■■■ In the past, the filed rate doctrine applied to both contract and common carriers. *Covey v. ConAgra, Inc.,* 788 F.Supp. 1160, 1162 (D.Colo.1992). In 1983, however, the ICC, through its exercise of statutory authority [1], exempted contract carriers from the filed rate doctrine. *Exemption of Motor Contract Carriers from Tariff Filing Requirements,* 133 M.C.C. 150 (1983), *aff'd sub nom. Central & S. Motor Freight Tariff Ass'n v. United States,* 757 F.2d 301 (D.C.Cir.), *cert. denied,* 474 U.S. 1019, 106 S.Ct. 568, 88 L.Ed.2d 553 (1985). The Motor Carrier Act defines "motor contract carrier" as:

a person providing motor vehicle transportation of property for compensation under continuing agreements with one or more persons—

(i) by assigning motor vehicles for a continuing period of time for the exclusive use of each such person; or

(ii) designed to meet the distinct needs of each such person.

49 U.S.C.A. § 10102(15)(B). A motor carrier must satisfy two requirements to be considered a contract carrier: the agreements must meet the "distinct needs" of the shipper and the agreements must be "continuing." *Dan Barclay v. Stewart & Stevenson Serv.,* 761 F.Supp. 194, 200 (D.Mass.1991). To fulfill the "distinct needs" requirement, a party must show a need "for a different or a more select or a more specialized service" than a common carrier can provide. *ICC v. J–T Transp. Co.,* 368 U.S. 81, 91, 82 S.Ct. 204, 210, 7 L.Ed.2d 147 (1961). Services may be considered more specialized to the extent that they differ "in quality, in priority, in control by the shipper, or in some other significant respect, from the service a common carrier holds out to the public at large." *Dan Barclay,* 761 F.Supp. at 200 (*quoting Dixie Midwest Express, Inc., Extension– General Commodities,* 132 M.C.C. 794 (1982)). In respect to the "continuing agreements" requirement, the ICC enacted a regulation defining continuing agreements as follows:

"No contract carrier by motor vehicle as defined in 49 U.S.C. § 10012(15) shall transport property for hire ... except under special and individual contracts or agreements which shall be in writing, shall provide for transportation for a particular shipper or shippers, shall be bilateral and impose specific obligations upon both carrier and shipper or shippers, shall cover a series of shipments during a stated period of time in contrast to contracts of carriage governing individual shipments...."

49 C.F.R. § 1053.1 (1991).

### III. Primary Jurisdiction

The Supreme Court has explained the doctrine of primary jurisdiction as follows:

The doctrine of primary jurisdiction, like the rule requiring exhaustion of administrative remedies, is concerned with promoting proper relationships between the

---

1. The Interstate Commerce Act provides in pertinent part that "[t]he Commission may grant relief from [the filed tariff requirements] to contract carriers when relief is consistent with the public interest and the transportation policy...." 49 U.S.C.A. § 10761(b) (West Supp. 1992).

courts and administrative agencies charged with particular regulatory duties. 'Exhaustion' applies where a claim is cognizable in the first instance by an administrative agency alone. 'Primary jurisdiction,' on the other hand, applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views.

No fixed formula exists for applying the doctrine of primary jurisdiction. In every case the question is whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation. These reasons and purposes have often been given expression by this Court. In the earlier cases emphasis was laid on the desirable uniformity which would obtain if initially a specialized agency passed on certain types of administrative questions. More recently, the expert and specialized knowledge of the agencies involved has been particularly stressed....

*United States v. Western Pacific R.R.*, 352 U.S. 59, 63–64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126 (1956).

■ The Interstate Commerce Commission is the administrative agency charged with expert skill and knowledge within the interstate transportation industry. Congress established the ICC when it enacted the Interstate Commerce Act. The ICC has a broad range of powers including regulation, investigation, adjudication, and enforcement. 49 U.S.C.A. §§ 10301–10388. The ICA is a comprehensive scheme of federal law governing charges, practices, duties, and liabilities of interstate transportation carriers.

## IV. The Nature of the Carriage

■ The threshold issue in this action is whether Plaintiff was operating as a common carrier or a contract carrier when it transported the goods tendered by Defendants.

Resolution of this issue depends upon an interpretation of the provisions of the statute, the regulations promulgated by the ICC, and case law. The Commission itself has stated repeatedly that it has primary jurisdiction to determine whether transportation subject to its regulation is contract carriage or common carriage. *Nonoperating Motor Carriers—Collection of Undercharges,* Ex Parte No. MC–208, 8 I.C.C.2d 742, 752 (1992); *Contracts for Transportation of Property,* Ex Parte No. MC–198, 8 I.C.C.2d 520, 529 (1992); *General Mills, Inc.,* 8 I.C.C.2d 313, 320 (1992). Courts also have referred the contract versus common carrier issue to the ICC pursuant to the doctrine of primary jurisdiction. *See, e.g., Atlantis Express v. Standard Transportation Serv.,* 955 F.2d 529, 533–34 (8th Cir.1992).

The ICC has recently repealed 49 C.F.R. § 1053. *Contracts for Transportation of Property,* Ex Parte No. MC–198, 8 I.C.C.2d 520 (1992). This change has caused considerable confusion as to what standards now apply in determining contract carriages. In the past, the ICC consistently required that there be a written bilateral contract for a contract carriage to exist. *Atlantis,* 955 F.2d at 534. In repealing the regulation, the ICC revoked the "technical" standards of section 1053, and replaced it with a "totality of the circumstances" test. *Contracts for Transportation,* 8 I.C.C.2d at 529. The Commission held that "it is the totality of the circumstances surrounding any particular movement, not the presence or absence of a written contract, that determines whether the transportation is contract carriage." *Id.* The Commission reasoned that by repealing the regulations, it would minimize the likelihood of litigation based on "technical noncompliance with § 1053.1." *Id.*

In repealing the regulation, the Commission emphasized its role in determining whether transportation is contract carriage or common carriage in light of the history of the statute, the purpose of Congress, and the national transportation policy. The ICC held that it had primary jurisdiction in determining "whether the transportation the carrier provides meets the statutory requirements of contract carriage." *Id.* The Court agrees

that reference of the contract carriage issue to the ICC is appropriate under the doctrine of primary jurisdiction. Congress defined the two forms of carriage, but left it to the Commission to interpret and apply those statutory definitions to make the distinction in practice in individual cases. This conclusion makes especial sense because the ICC is better equipped to determine whether the new standards it set forth in *Contracts for Transportation of Property*, Ex Parte No. MC–198, 8 I.C.C.2d 520 (1992), in order to determine whether a carrier has met the statutory requirements of contract carriage, will apply to the present dispute, and if so, how to interpret them. Referral to the ICC serves the two purposes of the doctrine of primary jurisdiction—it will promote uniformity in the application of the statutory scheme, and the agency's expert and specialized knowledge will aid in the resolution of this issue. *See ICC v. J–T Transp. Co.*, 368 U.S. 81, 94, 82 S.Ct. 216, 216, 7 L.Ed.2d 147 (1961); *Service Transfer Co. v. Virginia*, 359 U.S. 171, 177, 79 S.Ct. 714, 718, 3 L.Ed.2d 717 (1959) (interpretations of federal motor carrier certificates should be made in the first instance by the ICC). Accordingly, the issue of whether FP was transporting goods for Defendants in a contract carriage capacity will be referred to the ICC pursuant to the doctrine of primary jurisdiction.

## V. Rate Reasonableness

■ Defendants argue that even if the ICC or the Court finds that Plaintiff acted as a common carrier, Plaintiff may not enforce its filed tariff rates because they are unreasonable. Defendants argue that the issue of whether filed rates are reasonable is one within the primary, if not exclusive, jurisdiction of the ICC.

The Supreme Court recently restated the principle that the filed rate doctrine contains an important caveat: the filed rate is not enforceable if the ICC finds the rate to be unreasonable. *Maislin Industries, U.S. v. Primary Steel*, 497 U.S. 116, 128, 110 S.Ct. 2759, 2766, 111 L.Ed.2d 94 (1990). The Supreme Court has long recognized that the ICC has the primary responsibility for determining whether a rate is reasonable. *Great Northern Ry. v. Merchants Elevator Co.*, 259 U.S. 285, 291, 42 S.Ct. 477, 479, 66 L.Ed. 943 (1922) ("Whenever a rate, rule or practice is attacked as unreasonable or as unjustly discriminatory, there must be preliminary resort to the Commission.") *See also Thompson v. Texas Mexican Ry.*, 328 U.S. 134, 147, 66 S.Ct. 937, 945, 90 L.Ed. 1132 (1946) ("[I]n a long line of cases ... it has been held that where the reasonableness or legality of the practices of the parties was subject to the administrative authority of the Interstate Commerce Commission, the court should stay its hand until the Commission had passed on the matter."); *Pennsylvania R.R. v. United States*, 315 F.2d 460, 465 (3d Cir. 1963) ("[T]he issue of reasonableness of rates charged is one which Congress saw fit to entrust solely to the Commission....").

Plaintiff argues that a defendant shipper in an undercharge case can no longer raise rate reasonableness as a defense. Plaintiff contends that the filed rate doctrine requires a shipper or broker to pay the tariff rate first and then seek recovery of amounts determined to be unreasonable in a separate action. The courts of appeals had split on this issue, with a majority holding that a shipper may assert rate unreasonableness as a defense in an undercharge action brought by a carrier. *See Delta Traffic Serv. v. Transtop, Inc.*, 902 F.2d 101 (1st Cir.1990); *Duffy v. BMC Indus.*, 938 F.2d 353, 357–58 (2d Cir. 1991); *Advance United Expressway v. Eastman Kodak*, 965 F.2d 1347, 1349 (5th Cir. 1992); *Western Transportation Co. v. Wilson & Co.*, 682 F.2d 1227, 1231–32 (7th Cir.1982); *Atlantis Express v. Standard Transp. Serv.*, 955 F.2d 529, 535–37 (8th Cir.1992); *Milne Truck Lines v. Makita U.S.A.*, 970 F.2d 564 (9th Cir.1992). Only the Fourth Circuit held the unreasonable rate defense invalid and held that a shipper must pay the tariff rates first and then seek relief in a separate action for damages. *In re Carolina Motor Express, Inc.*, 949 F.2d 107, 110–11 (4th Cir.1991).

The Supreme Court recently reviewed the Fourth Circuit's decision and reversed it. *Reiter v. Cooper*, —— U.S. ——, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993). The Interstate Commerce Act requires carriers' rates to be "reasonable," section 10701(a), and gives shippers an express cause of action against

carriers for damages in the amount of the difference between the tariff rate and the rate determined to be reasonable by the ICC. § 11705(b)(3). The Court held that while it may be true in a technical sense that rate unreasonableness is not a defense, since section 11705(b)(3) provides a cause of action rather than a defense, a shipper could, and often must, assert that cause of action as a counterclaim to the carrier's undercharge action. The Court treated the shipper's unreasonable rate defenses as counterclaims because they related to the same shipments for which the carriers sought to collect the tariff rate. *Reiter,* ——— U.S. at ————–———, 113 S.Ct. at 1215–19. The Court held that the filed rate doctrine did not prohibit shippers from asserting by way of claim or counterclaim the rights explicitly conferred by section 11705(b)(3). *Id.* at ———, 113 S.Ct. at 1217–19. The Court then rejected the carriers argument that payment of the tariff rate was a prerequisite to litigating the reasonable rate issue. The Court held that shippers may assert a claim under section 11705(b)(3) before payment, but after their shipments were delivered. *Id.* at ———, 113 S.Ct. at 1219–21.

■ Applying the *Reiter* decision to the facts of this case, the Court concludes that Defendants have properly raised the unreasonable rate issue. Defendants raise the unreasonable rate issue as an affirmative defense. Like the Supreme Court, however, and for the same reasons as stated in their opinion, this Court will treat this affirmative defense as a counterclaim for damages under section 11705(b)(3). Defendants claim under section 11705(b)(3) is properly raised here, because it relates to the same shipments for which Plaintiff seeks to collect the filed rates. *Reiter,* ——— U.S. at ———, 113 S.Ct. at 1217–19. Under the holding of *Reiter,* Defendants need not pay Plaintiff first prior to raising the unreasonable rate issue.

■ The ICC has interpreted section 11705(b)(3) as giving it no power to decree relief. Shippers must institute a claim or counterclaim in the courts, which would then "refer" the issue of rate reasonableness to the Commission. *Informal Procedure for Determining Motor Carrier and Freight*

*Forwarder Reparation,* 335 I.C.C. 403, 414 (1969). The ICC continues to adhere to that view. *NITL—Petition to Institute Rulemaking on Negotiated Motor Common Carrier Rates,* 3 I.C.C.2d 99, 106–07 (1986); *NITL—Petition to Institute Rulemaking on Negotiated Motor Common Carrier Rates,* 5 I.C.C.2d 623, 625 (1989). The Supreme Court held this interpretation of the statute reasonable and therefore binding. *Reiter,* ——— U.S. at ———, 113 S.Ct. at 1219–21.

■ To justify referral to the ICC, the shipper must at least make a threshold showing that the filed rates are unreasonable. *Branch Motor Express Co. v. Caloric Corp.,* No. 89–1130, slip op. at 4, 914 F.2d 241 (3d Cir.1990) (table) (unpublished) (mere mention of rate unreasonableness not sufficient to justify referral to ICC); *Atlantis Express v. Standard Transp. Serv.,* 955 F.2d 529, 537 (8th Cir.1992). Plaintiff contends that the criteria for determining unreasonableness lie within the statutory framework of 49 U.S.C.A. § 10701(e). Since Defendants did not address the standards contained in section 10701(e), Plaintiff contends that Defendants have failed to meet the evidentiary threshold necessary for referral to the ICC.

■ Plaintiff improperly applies the standards of section 10701(e). Congress enacted section 10701(e) to address rate prescriptions for the future. *Petitions for Issuance of Rate Reasonableness and Unreasonable Practices Policy Statement,* Ex Parte No. MC–177 (Sub–No. 2), 8 I.C.C.2d 61, 73 (1991). It did not intend it to be used to determine the reasonableness of past rates. *Id.* at 74. The ICC has stated that "the few cases in which the Commission has addressed § 10701(e) have all been prescription cases." *Id.* at 74 n. 21. This Court concludes that the ICC's criteria for determining rate unreasonableness as stated in *Petitions for Issuance* provides guidance in deciding whether Defendants have fulfilled the evidentiary requirements necessary to justify referral of the unreasonableness issue to the ICC. The ICC stated in *Petitions for Issuance* that "[a]lthough there is no single fixed test which the Commission applies to rate reasonableness cases," some general criteria include

"(a) relevant rate comparisons, (b) a carrier's proffer of a particular rate, (c) whether the rate would have moved the traffic had it been assessed at the time the shipment took place, (d) the class rates for like traffic, and (e) tariff analysis." *Id.* at 74.

 Defendants by affidavit, and by reference to Exhibit A of Plaintiff's amended complaint, have provided evidence to show that the tariff rates in effect at the time of the shipments were well above the negotiated contract rates—an average of 118 percent higher than the contract rates for claims against Defendant Ken Way, and an average of 138 percent higher on claims against Defendant Palmer. While Defendants have not provided the Court with evidence of the competitive rate levels generally available in the industry to compare with Plaintiff's filed tariff rates, *see Horn's Motor Express v. Harrisburg Paper Co.,* 765 F.Supp. 211, 217 (M.D.Pa.1991), the Court nevertheless concludes that the evidence presented by Defendants is sufficient to justify referral to the ICC. The Court will accordingly refer the issue of rate unreasonableness to the ICC pursuant to the doctrine of primary jurisdiction.

 Defendant has also raised affirmative defenses to Plaintiff's amended complaint concerning the tariff-based rates that properly apply, the proper interpretation and construction of these tariff-based rates, and the proper method of calculating the amount it owes to Plaintiff under the filed rate doctrine. The ICC has stated that it has "primary jurisdiction over all issues regarding the lawfulness, applicability, and reasonableness of tariffs, over what constitutes bona fide contract carriage, and over credit and collection practices by motor carriers. Consequently, these issues should be tested initially before us (subject to appropriate judicial review if necessary)." *Nonoperating Motor Carriers—Collection of Undercharges,* Ex Parte No. MC–208, 8 I.C.C.2d 742, 752 (1992). The Court, therefore, will refer these issues to the ICC under the doctrine of primary jurisdiction.

Finally, the Supreme Court in *Reiter v. Cooper* noted that the use of the term "referral" to the ICC is technically incorrect because the Interstate Commerce Act does not contain a mechanism for a court, on its own authority, to demand or request a determination from the ICC. Rather, the court merely stays its proceedings while the shipper files an administrative complaint under 49 U.S.C. § 11701(b). *Reiter v. Cooper,* —— U.S. ——, —— n. 3, 113 S.Ct. 1213, 1220 n. 3, 122 L.Ed.2d 604 (1993). In this case, Defendant Ken Way filed a petition for declaratory relief before the Commission on July 20, 1992 in which it asked the ICC to determine the nature of the carriage and the issues of tariff application and interpretation, rate reasonableness, and the method of calculation under the filed rate doctrine. Accordingly, this Court will stay the proceedings in this action pending the decision of the ICC on Defendant's petition.

An appropriate order follows.

### ORDER

Upon consideration of Defendants Ken Way Transportation, Inc., R.M. Palmer Company, and M. Polaner, Inc.'s motion to stay proceedings in this action and to refer certain issues to the Interstate Commerce Commission, Plaintiff F.P. Corp.'s response, and Defendants' reply:

1. Defendants' motion to stay proceedings in this action is GRANTED.

2. This action is STAYED pending the decision of the Interstate Commerce Commission in *Ken Way Transportation, Inc.—Petition For Declaratory Order—Certain Rates and Practices of F.P. Corp.,* Docket No. 40840.

3. The Clerk of this Court shall mail a certified copy of this Memorandum and Order to the Interstate Commerce Commission. The Court requests that the Commission forward a copy of its decision of Ken Way Transportation, Inc.'s petition for a declaratory order to the Clerk of this Court.

4. The Court will place this matter in civil suspense until the Interstate Commerce Commission renders its decision or upon further order of this Court.

IT IS SO ORDERED.