**SIEGEL TRANSFER, INC., Robin Express Transfer, Inc., and Joruss Trucking, Inc., Plaintiffs,**

v.

**CARRIER EXPRESS, INC., Bethtran, Inc., and Bethlehem Steel Corporation, Defendants.**

**Civ. A. No. 92–CV–7370.**

United States District Court, E.D. Pennsylvania.

July 1, 1994.

---

David H. Moskowitz, Malvern, PA, for plaintiffs.

William J. O'Brien, Nancy J. Gellman, and Debra C. Swartz, Philadelphia, PA, for defendants.

## OPINION AND ORDER

VAN ANTWERPEN, District Judge.

This civil action arose out of a written contract for transportation services between Plaintiff Siegel Transfer, Inc. ("Siegel Transfer") and defendants Carrier Express, Inc. ("Carrier Express") and Bethtran, Inc. ("Bethtran"). The dispute centers around the January 4, 1990 termination of the contract and alleged refusals on the part of defendants to conduct further business between the parties. Plaintiffs assert two federal law claims: first, a violation of section 1 of the Sherman Act, 15 U.S.C. § 1 (Count I) and, second, so-called "transportation law" claims brought under the Interstate Commerce Act, 49 U.S.C. § 10761 et seq. and Section 41 of the Elkins Act 49 U.S.C. §§ 11902, 11903 and 11915 (Count XI). Plaintiffs also bring numerous state law

1

claims.[1] We have jurisdiction over the federal claims pursuant to 28 U.S.C. §§ 1331 & 1337, and 15 U.S.C. § 15. In addition, we have diversity jurisdiction in this matter pursuant to 28 U.S.C. § 1332.[2]

Discovery in this matter ended on March 17, 1994. Before us now are two motions, Defendants' Motion to Dismiss Plaintiffs' Transportation Law Claims, or, In the Alternative, to Refer to the Interstate Commerce Commission Plaintiffs' Transportation Law Claims ("Motion to Dismiss"), filed March 21, 1994, and Defendants' Motion for Summary Judgment, also filed March 21, 1994. Based upon these motions and accompanying memoranda, plaintiffs' responsive memoranda, and defendants' reply memoranda, we now resolve both of these motions.

## I. Facts

### A. *Regulation of Motor Carriers*

We begin our discussion of the relevant undisputed facts with a brief overview of the regulatory regime governing the transportation of goods by motor carriers. Congress first set forth the transportation policy it intends to govern interstate carriers in the Interstate Commerce Act, 24 Stat. 379 (1887) currently codified at 49 U.S.C. § 10101 *et seq.* As goals of this policy, federal regulation of transportation should promote fairness and efficiency. *Freightcor Services, Inc. v. Vitro Packaging, Inc.,* 969 F.2d 1563, 1570 (5th Cir.1992), *cert. denied* —— U.S. ——, 113 S.Ct. 979, 122 L.Ed.2d 133 (1993); 49 U.S.C. § 10101.

The transport of goods by motor carriers is subject to regulation by the Interstate Commerce Commission (ICC), and motor carriers are generally required to obtain op-

erating authority permits from the ICC in order to transport goods in interstate commerce. 49 U.S.C. §§ 10521, 10921–23. There are two types of operating authority for motor carriers who transport goods: (1) motor common carrier and (2) motor contract carrier.

A motor common carrier is defined in the Interstate Commerce Act as a "person holding itself out to the general public to provide motor vehicle transportation for compensation over regular or irregular routes, or both." 49 U.S.C. § 10102(14). Common carriers are required to file their rates for transporting goods with the ICC and charge their rates to all shippers. 49 U.S.C. § 10761.

A motor contract carrier of property is defined as "a person providing motor vehicle transportation of property for compensation under continuing agreements with one or more" shippers by either dedicating equipment or by meeting the shipper's distinct needs. 49 U.S.C. § 10102(15)(B). Since 1983, contract carriers have been exempt from the rate filing and uniform rate requirements mentioned above. *Exemption of Motor Contract Carriers from Tariff Filing Requirements,* Ex Parte No. MC–165, 133 M.C.C. 150 (1983), *aff'd, Central and Southern Motor Freight Tariff Association, Inc. v. United States,* 757 F.2d 301, 305–306, 322–330 (D.C.Cir.), *cert. denied,* 474 U.S. 1019, 106 S.Ct. 568, 88 L.Ed.2d 553 (1985).

### B. *The Parties*

The three plaintiff companies are:

(1) Siegel Transfer, formed in 1980, which had ICC operating authority as a contract carrier from 1986 until early 1990, but never owned any trucks or had any employees;[3]

---

1. Plaintiffs' state law claims are as follows: Maryland Anti–Trust Act (Count II); Breach of Contract, Plaintiffs v. Carrier Express (Count III); Breach of Contract, Plaintiffs v. Bethtran (Count IV); Promissory Estoppel (Count VI); Implied Covenant of Good Faith, Plaintiffs v. Carrier Express (Count VII); Implied Covenant of Good Faith, Plaintiffs v. Bethtran (Count VIII). Counts V, IX, and X were deleted in Plaintiffs Amended Complaint, filed February 15, 1994.

2. In our opinion dated June 21, 1994, we dismissed plaintiffs' state law claims without preju-

dice to plaintiffs' right to pursue these claims in state court. Since we have diversity jurisdiction over these claims, we vacated our opinion and order of June 21, 1994 by our order of June 28, 1994 and we now issue this Opinion and Order in which we address plaintiffs' federal and state law claims.

3. Defs.Exhibit E (R. Siegel Dep. 10/26/93) at 12–14, 16; Defs.Exhibit A, Pls.Response to Defs.Request for Admission No. 50—Set No. 3.

(2) Robin Express, formed in 1964, which owned trucking equipment, employed drivers, and leased equipment and drivers to Siegel Transfer and other companies;[4] and

(3) Joruss Trucking, formed in 1987, which owned trucks which it leased to Siegel Transfer.[5]

The three plaintiff companies are all owned by Russell Siegel and his wife.[6]

The defendants include a parent and its subsidiaries. Defendant Bethlehem Steel owns the Philadelphia, Bethlehem and New England Railroad (PB & NE). PB & NE owns defendant Bethtran, and Bethtran owns defendant Carrier Express.[7]

### C. *The Contract Between Siegel Transfer and Carrier Express*

In late 1985, Russell Siegel, the owner of Siegel Transfer, contacted Bethtran and proposed the following: leasing his own transport equipment and getting a percentage of the Carrier Express freight rate. The agreement that the two parties eventually reached provided that Siegel Transfer would get 90 percent of the freight rate Carrier Express received from its shipper.[8]

The written contract between Siegel Transfer, Carrier Express and Bethtran was effective January 4, 1986.[9] During the four years that the contract was in effect, Siegel Transfer had contract carrier operating authority from the ICC which enabled it to transport goods for shippers with whom it had a transportation contract.[10] Siegel Transfer transported goods for Carrier Express originating, for the most part, from Bethlehem Steel's Sparrows Point, Maryland plant, and it also transported goods on its own account originating from other shippers.[11] For loads transported for Carrier Express under contract, Siegel Transfer provided its own insurance, and it was paid 90 percent of the freight rate received by Carrier Express from the shipper.[12]

### D. *The Contracts Between Bethlehem Steel and Carrier Express*

Carrier Express had a transportation contract with Bethlehem Steel pursuant to which it agreed to transport Bethlehem products under Carrier Express's contract carrier ICC operating authority. The rates for the transportation services were determined by Carrier Express and Bethlehem in accordance with the terms of the contract. Carrier Express performed the contract by transporting some of the freight itself and arranging with Siegel Transfer to handle other shipments.[13]

During the period January 1, 1987 to May 1, 1993, Bethlehem Steel also had a written contract with Carrier Express whereby Bethlehem Steel received a refund of five percent of the total revenues from Bethlehem Steel freight transported by Carrier Express.[14] With respect to the Bethlehem

---

4. Defs.Exhibit E (R. Siegel Dep. 10/26/93) at 16–17.

5. Defs.Exhibit E (R. Siegel Dep. 10/26/93) at 20–22.

6. Defs.Exhibit E (R. Siegel Dep. 10/26/93) at 6.

7. Defs.Exhibit C, Petition for Exemption Under 49 U.S.C. § 11343(e) on behalf of PB & NE and Bethlehem Steel Corporation, dated December 9, 1985 (Dep.Ex. 50) & (O'Malley Dep.) at 5, 8, 31–32.

8. Defs.Exhibit E (R. Siegel Dep. 10/26/93) at 172–73; Defs.Exhibit F (R. Siegel Dep. 11/9/93) at 35–36.

9. Defs.Exhibit B, Contract dated January 4, 1986 (Dep.Ex. 12); Exhibit E (R. Siegel Dep. 10/26/93) at 169–170. The contract was entered into by Carrier Express, Inc. and "Bethtran, Inc. doing business as Carrier Express, Inc." In July, 1988,

Bethtran ceased doing business as a trucking company and focused its operations on providing management services. Defs.Exhibit G (Mollman Dep. at 8–9, 115).

10. Defs.Exhibit E (R. Siegel Dep. 10/26/93) at 16, 159–160; Defs.Exhibit A, Pls.Response to Defs.Request for Admission No. 50—Set No. 3.

11. Defs.Exhibit E (R. Siegel Dep. 10/26/93) at 158–160, 173.

12. Defs.Exhibit B (Carrier/Siegel Transfer Contract); Defs.Exhibit A, Pls.Response to Defs.Request for Admission No. 38—Set No. 3.

13. Defs.Exhibits B & H.

14. Defs.Exhibit K, Refund Contract (Dep.Exs. 33–34); Defs.Exhibit G (Mollman Dep.) at 8–9, 113–115; Defs.Exhibit A, Pls.Response to

Steel freight transported by Siegel Transfer, the five percent refund was paid to Bethlehem Steel out of the 90% portion of the freight rate retained by Carrier Express.[15]

### E. The Termination of the Carrier Express—Siegel Transfer Contract

Carrier Express terminated the contract with Siegel Transfer by giving written notice to Siegel Transfer on January 4, 1990. Carrier Express claims that it terminated the contract because James C. Matthews, Carrier Express's Vice-President, determined that Siegel Transfer had been transporting Bethlehem Steel freight in a manner violative of Bethlehem and Carrier Express policies concerning legal weight limits and other safety concerns. (Defendants' Motion for Summary Judgment, at 15–16).

## II. Standard of Review

Our analysis of defendants' motion for summary judgment is governed by Rule 56(c) of the Federal Rules of Civil Procedure, which provides for summary judgment where the:

> pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.

"The party moving for summary judgment must demonstrate that, under the undisputed facts, the non-movant has failed to introduce evidence supporting a necessary element of his case." *In Re Phillips Petroleum Secur. Litigation*, 881 F.2d 1236, 1243 (3d Cir.1989). To defeat summary judgment, the non-moving party must respond with facts of record that contradict the facts identified by the movant and may not rest on mere denials. *Celotex Corp. v. Catrett*, 477 U.S. 317, 321 n. 3, 106 S.Ct. 2548, 2552 n. 3, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(e)); *see also First Nat. Bank v. Lincoln Nat. Life Ins. Co.*, 824 F.2d 277, 282 (3d Cir.1987). The non-moving party must demonstrate the existence of evidence that would support a jury finding in its favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986).

Defendant also moves to dismiss plaintiffs' transportation law claims under Fed.R.Civ. Proc. 12(b)(6). The standard for reviewing a Rule 12(b)(6) motion is also well-settled. In reviewing a complaint, we must accept all allegations and reasonable inferences that can be drawn therefrom as true and view them in a light most favorable to the non-moving party. *Sturm v. Clark*, 835 F.2d 1009, 1011 (3d Cir.1987) (citations omitted). A complaint may properly be dismissed "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984) (citing *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101, 2 L.Ed.2d 80 (1957)). Thus, our decision rests on the legal sufficiency of the plaintiffs' case.

## III. Analysis

### A. Antitrust Claims

In Count I of their Amended Complaint, plaintiffs assert an antitrust claim based on section 1 of the Sherman Act. Plaintiffs claim that defendants and their alleged co-conspirators acted in concert to restrain competition in the transportation of steel products by boycotting Siegel. (Amended Complaint, ¶ 34). In particular, they complain of the following actions taken by defendants: the decision to and eventual termination of Siegel's contract; the post-termination refusal to do business with Siegel; defendants notifying their customers that Siegel was no longer doing business with them; and violating the Interstate Commerce Act in an attempt to restrain trade. (Amended Complaint, ¶ 35).

In order for the aforementioned activities to constitute a section 1 Sherman Act violation, the plaintiffs must establish the follow-

---

Defs.Request for Admission No. 31 & 37—Set No. 3.

**15.** Exhibit A, Pls.Response to Defs.Request for Admission No. 39—Set No. 3; Exhibit F (R. Siegel Dep. 11/9/93) at 38–40; Exhibit G (Mollman Dep.) at 21–23.

ing four elements: (1) that the defendants contracted, combined or conspired among each other; (2) that the combination or conspiracy produced adverse, anti-competitive effects within the relevant product and geographic markets; (3) that the objects of and the conduct pursuant to that contract or conspiracy were illegal; and (4) that the plaintiffs were injured as a proximate result of that conspiracy. *Tunis Bros. Co. v. Ford Motor Co.*, 763 F.2d 1482, 1489 (3d Cir. 1985).[16] In their motion for summary judgment, defendants focus upon plaintiffs' inability to, among other things, demonstrate the first element—concerted action. We believe this argument is dispositive of defendants' motion.

 Section 1 of the Sherman Act targets unreasonable restraints of trade effected by a "contract, combination . . . or conspiracy" between separate entities. As the Supreme Court held in the seminal case of *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768, 104 S.Ct. 2731, 2740, 81 L.Ed.2d 628 (1984), section 1 "does not reach conduct that is 'wholly unilateral.'" *Id.* Properly discriminating between unilateral and concerted conduct, the *Copperweld* Court explained, is necessary to effectuate the dual anti-trust goals of prohibiting coordinated and anti-competitive efforts of separate economic actors while permitting intrafirm cooperation aimed at healthy market competition. The Court reasoned:

> [I]t is perfectly plain that an internal "agreement" to implement a single, unitary firm's policies does not raise the antitrust dangers that § 1 was designed to police. The officers of a single firm are not separate economic actors pursuing separate economic interests, so agreements among them do not suddenly bring together economic power that was previously pursuing divergent goals. Coordination within a firm is as likely to result from an effort to compete as from an effort to stifle competition. In the marketplace, such coordination may be necessary if a business enter-

prise is to compete effectively. For these reasons, officers or employees of the same firm do not provide the plurality of actors imperative for a § 1 conspiracy.

*Id.*, 467 U.S. at 769, 104 S.Ct. at 2740–2741. Thus, for purposes of section 1 of the Sherman Act, a corporation is incapable of conspiring illegally with its officers and employees.

The same reasoning, the Court held, applies to corporations and their subsidiaries. The interests of these two entities are in complete conformity. Acting with common objectives, a corporation and its subsidiary are guided by one "corporate consciousness." Consequently, the *Copperweld* court ruled:

> With or without a formal "agreement," the subsidiary acts for the benefit of the parent, its sole shareholder. If a parent and a wholly owned subsidiary do "agree" to a course of action, there is no sudden joining of economic resources that had previously served different interests, and there is no justification for a § 1 scrutiny.

*Id.*, 467 U.S. at 771, 104 S.Ct. at 2742. In sum, a corporation cannot conspire with its officers, employees, or with the officers and employees of its subsidiaries.

 A buyer or seller "generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently." *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 761, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984). Thus, a section 1 plaintiff complaining of a refusal to deal must produce evidence that "tends to exclude the possibility that the [defendants] were acting independently." *Id.*, 465 U.S. at 764, 104 S.Ct. at 1471.

When we apply these principles to the facts of this case, it becomes evident that the plaintiffs have failed to produce evidence of concerted action between two or more separate economic actors. Plaintiffs claim that the following evidence demonstrates concerted action: (1) PB & NE is not a wholly

---

**16.** In 1986, the Supreme Court vacated this opinion and remanded the case for further consideration in light of *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). On remand, the

Third Circuit held that *Matsushita* required the same result reached in the original opinion. *Tunis Bros. Co. v. Ford Motor Co.*, 823 F.2d 49 (3d Cir.1987).

owned subsidiary and, consequently, the *Copperweld* doctrine is inapplicable; (2) a meeting, attended by James Matthews, William Van Heel, Tom Rediehs, Kermit Bryan and Russ Siegel during which Russ Siegel was informed that his Carrier Express contract has been terminated; and (3) the relationships and motivations of the various parties involved in the contract termination and subsequent alleged refusal to deal. We examine this evidence in turn.

### 1. Applicability of Copperweld Doctrine

 Defendants argue that the only parties involved in the alleged contract termination and subsequent refusal to deal are officers or employees of either Bethlehem, its subsidiaries (Bethtran or Carrier Express) and its agents. Since these parties represent employees and officers of commonly owned companies, defendants argue, the *Copperweld* doctrine precludes a finding of concerted action. Plaintiffs' first response is that since Bethlehem does not own 100% of the shares of PB & NE, but Bethlehem is instead only a 99.92% owner,[17] *Copperweld* is inapplicable. Plaintiffs' narrow reading of the *Copperweld* decision is misguided. While it is true that the *Copperweld* court dealt specifically with a one hundred percent subsidiary, our focus under *Copperweld* is on the economic substance of an arrangement, not merely its form. *Weiss v. York Hospital,* 745 F.2d 786, 815 (3d Cir.1984). Courts applying the *Copperweld* doctrine have looked to the legal power of a parent to control a subsidiary, and have ruled that a de minimis difference between the parent's percentage ownership and 100% ownership does not diminish *Copperweld*'s applicability. *See e.g. Bell Atlantic Business Systems Services v. Hitachi Data Systems Corporation,* 849 F.Supp. 702 (N.D.Cal.1994) (summary judgment granted on section 1 claim where one defendant owned 80% of another which owned 100% of a third; court held, as a matter of law, that these companies could not conspire among themselves to restrain trade in violation of section 1); *Aspen Title & Escrow, Inc. v. Jeld–Wen, Inc.,* 677 F.Supp. 1477, 1486 (D.Or.1987) (summary judgment in section 1 claim granted where one defendant owned 97.5% of another defendant because these companies are incapable of conspiring with one another); *Satellite Financial Planning Corp. v. First National Bank,* 633 F.Supp. 386, 395 (D.Del.1986). Here, the fact that Bethlehem owns all but .08% of the stock of PB & NE does not change the economic reality that Bethlehem has complete control over the affairs of PB & NE and that, consequently, they have a unity of interests making them incapable of conspiring with one another.

### 2. The Termination Decision and the January 4, 1990 Meeting

 Plaintiffs focus their arguments primarily on a second piece of evidence, namely the meeting attended by James Matthews, William Van Heel, Tom Rediehs, Kermit Bryan[18] and Russ Siegel at which Mr. Siegel was notified of the contract termination. Plaintiffs urge that the decision to terminate the contract and the implementation of that decision at the January 4, 1990 meeting constitutes concerted action.

There are numerous problems with plaintiffs' legal conclusion that this meeting constitutes concerted action. First, the evidence uniformly demonstrates that James Matthews, Vice President of Carrier Express and Bethtran, made the decision on his own to terminate Carrier Express's contract with

---

**17.** Plaintiffs do not provide the specific stock ownership figures in their opposition memorandum, but defendants have done so in their reply memorandum. Bethlehem owns 8,993 of the 9,000 shares of PB & NE stock, or 99.92% of the stock. (Defendants' Reply Memorandum, at 30.)

**18.** James Matthews is the Vice–President and member of the Board of Directors of both Carrier Express and Bethtran. Mr. Van Heel is a Bethlehem Steel Employee and a Bethtran Board member. Mr. Rediehs is a former Vice President and former owner of Carrier Express, an owner of Oak Management which manages the offices of Carrier Express and Rediehs Express, and his family owns Rediehs Express, Inc. which is a large carrier for Bethlehem Steel. Kermit Bryan is employed by Oak Management. He is also a member of the Board of Directors of Rediehs Express, Inc. Memorandum of Plaintiffs' in Opposition to Defendants' Motion for Summary Judgment (hereinafter "Plaintiffs' Opposition Memorandum") at 8, 14–15.

Siegel Transfer.[19] Although Mr. Matthews informed others at Carrier Express, Bethtran and Bethlehem Steel of his decision before he notified Siegel Transfer, he was the person who made the decision.[20] Plaintiffs concede that Mr. Matthews was the primary decision-maker concerning the termination decision.[21] Mr. Matthews, an employee of Carrier Express and Bethtran, was incapable as a matter of law of conspiring with his employers or with his fellow employees regarding this termination decision. The evidence overwhelmingly demonstrates that the termination decision was made before the January 4, 1990 meeting. Thus, it appears as though the January 4 meeting was nothing more than as an announcement of a fait accompli, rather than "concerted action." But even if we view the meeting as evidence of a coordinated effort, plaintiffs still cannot demonstrate "concerted action."

■ Plaintiffs argue that the January 4, 1990 meeting at which the termination decision was discussed, and during which Mr. Siegel was notified of the decision, amounts to concerted action.[22] We disagree because those in attendance at the meeting were legally incapable of conspiring with Mr. Matthews for the purposes of section 1. To begin with, William Van Heel is a Bethlehem Steel Employee and a Bethtran Board member. He and Mr. Matthews are incapable of conspiring with one another in violation of section 1 as they are employees of the same company.

■ Tom Rediehs and Kermit Bryan are affiliated with Oak Management. Oak Management was under contract to manage the day to day operations of Carrier Express.[23] We believe that by serving as managers of Carrier Express, Oak Management and its

employees (Tom Rediehs and Kermit Bryan) were agents of Carrier Express and incapable of conspiring with Carrier Express and its parent corporations.

In determining whether two entities are separate for the purposes of a section 1 conspiracy, we must look to the "economic substance of the relationship" between the two entities. *Weiss v. York Hospital, supra,* 745 F.2d at 815; *Pink Supply Corp. v. Hiebert, Inc.,* 788 F.2d 1313 (8th Cir.1986). The "substance" of the arrangement depends on the economic incentives of the parties. *Weiss v. York Hospital, supra,* 745 F.2d at 815. In *Weiss,* the Third Circuit discussed the potential for a hospital to conspire with its medical staff. The medical staff was empowered to make staff privilege decisions on behalf of the hospital. The court held that, despite the fact that they had independent economic interests in competition with one another, the medical staff as an entity had no interest in competition with the hospital. *Id.,* at 817. The *Weiss* decision follows several other reported cases in which courts have held that agents cannot conspire with their principals for the purposes of section 1 because they do not constitute separate economic entities. *See Potters Medical Center v. City Hospital Association,* 800 F.2d 568 (6th Cir.1986); *Pink Supply Corp. v. Hiebert, Inc., supra; Fuchs Sugars and Syrups, Inc. v. Amstar Corp.,* 602 F.2d 1025 (2d Cir.1979), *cert. denied,* 444 U.S. 917, 100 S.Ct. 232, 62 L.Ed.2d 172 (1979).

Oak Management acted as an agent for Carrier Express. The company was obligated contractually to oversee the day-to-day operations of Carrier Express, in the same way that officers and directors of Carrier Express would manage the corporation. Oak

---

19. Defs.Exhibit J (Matthews Dep.) at 170–172.

20. Defs.Exhibit J (Matthews Dep.) at 170–172; Exhibit I (Van Heel Dep.) at 106–111; Exhibit Q (Rediehs Dep.) at 9–10.

21. Defs.Exhibit L, Pls.Response to Defs.Request for Admission No. 14—Set No. 1; Plaintiffs' Opposition Memorandum, at 15 & 47.

22. In addition to the meeting, plaintiffs point to a letter, signed by all four in attendance at the meeting, "evidencing that all four were completely in accord with the decision." Plaintiffs'

Opposition Memorandum, at 48. Since we find for the reasons that follow that all four of these men were incapable of conspiring with one another for the purposes of section 1, we do not consider this letter, like the meeting itself, evidence of concerted action.

23. Plaintiffs' Exhibit 56 is the Oak Management/Bethtran contract, with its amendments, for the day-to-day management of Carrier Express.

Management was under a duty to act in the interests of Carrier Express, and Carrier Express ultimately controlled the actions of its agent, Oak Management. As such, an agreement between Oak Management and Carrier Express to terminate the Siegel Transfer contract "does not represent a sudden joining of two independent sources of economic power previously pursuing separate interests." *Copperweld, supra,* 467 U.S. at 771, 104 S.Ct. at 2741; *see also Pennsylvania Independent Business Association, Inc. v. Unicorn Marketing,* 1985 WL 2812 (E.D.Pa. September 23, 1985) (motion to dismiss granted where court concludes insurance company incapable of conspiring with its agents over whom it had power to assert control in the conduct of its business affairs). Therefore, Tom Rediehs and Kermit Bryan, acting in their capacity as officers/employees of Oak Management, cannot be found to have conspired with the defendants for purposes of our section 1 scrutiny.

■ Plaintiffs argue that Tom Rediehs and Kermit Bryan stood to gain from the termination of the Siegel contract, and that a jury trial is necessary to determine the true motives and intentions behind their participation in the termination decision. For example, plaintiffs argue that Tom Rediehs, by virtue of his relationship to Rediehs Express, another carrier, stood to gain by the potential increase in business resulting from the termination of the Siegel Transfer contract. (Plaintiffs' Opposition Memorandum, at 20.) While they do not cite to the relevant authorities, we assume that plaintiffs are attempting to invoke the recognized exception to the *Copperweld* rule that if corporate officers or employees act for their own interests, and outside the interests of the corporation, they are legally capable of conspiring with their employers for purposes of section 1. *Tunis Brothers Co. v. Ford Motor Co., supra,* 763 F.2d at 1496; *International Travel Arrangers v. NWA, Inc.,* 991 F.2d 1389, 1398 (8th Cir.1993), *cert. denied,* — U.S. ——, 114 S.Ct. 345, 126 L.Ed.2d 309 (1993).

Plaintiffs cannot rely on this exception. While plaintiffs hypothesize about the potential interests and motivations of James Matthews, William Van Heel, Tom Rediehs, Kermit Bryan, the fact remains that these men were acting on behalf of Carrier Express in terminating the contract. "[I]t is perfectly plain than an internal 'agreement' to implement a single, unitary firm's policies does not raise the antitrust dangers that § 1 was designed to police." *Copperweld, supra,* 467 U.S. at 769, 104 S.Ct. at 2740. What's more, while plaintiffs make reference to alleged personal interests of the four men which are distinct from those of Carrier Express, plaintiffs have alleged no interest on their part *in competition with Carrier Express.* It is the joining together of formerly competitive interests which implicates the antitrust laws. *See Weiss v. York Hospital, supra,* 745 F.2d at 817. *Pennsylvania Independent Business Association, Inc. v. Unicorn Marketing, supra.*

■ Finally, and most importantly, plaintiffs have conceded that Tom Rediehs opposed the termination of the contract.[24]

---

**24.** Mr. Rediehs repeatedly argued against the termination from the time Mr. Matthews first told him about it, up to and including the day Mr. Siegel was informed of the decision. He did so because he did not want to lose the revenue generated by the Siegel Transfer operation, and he did not believe Siegel's equipment could be replaced by Carrier Express. (Defs.Suppl.Ex. 4, Rediehs Affidavit ¶ 3–6; Defs.Exhibit Q (Rediehs Dep.) at 9–10; Exhibit R (Bryan Dep.) at 60–61; Defs.Exhibit J (Matthews Dep.) at 170–172; Defs. Suppl.Ex. 14 (Rediehs Dep.) at 9–22, 57–59).

There appears to be no evidence that Kermit Bryan disagreed with Mr. Rediehs concerning his opposition to the Siegel termination decision. Mr. Bryan was an employee of Oak Management, a company owned by Mr. Rediehs, and therefore Mr. Redieh's subordinate. Plaintiffs have presented evidence that Mr. Bryan cannot remember when he first learned of the decision to terminate the Siegel contract, and that he was fairly passive at the meeting at which Mr. Siegel was informed of the decision. (Pls.Exhibit 16 (Bryan Deposition), at 60–61). Defendants have provided further excerpts from the Bryan Deposition, in which he states that, beginning in the middle of 1988, there were ongoing discussions with Mr. Siegel about alleged safety violations by Siegel Transfer. (Defs.Ex. 2, (Bryan Deposition) at 41–67). The parties make little mention in their pleadings of Mr. Bryan, aside from his attendance at the January 4 meeting. We must assume that, at most, Mr. Bryan shared the views of his superior, Mr. Rediehs; at least, Mr. Bryan did not actively oppose or attempt to undermine the position of Mr. Rediehs. Plaintiffs do not argue nor have they presented any evidence to the contrary. Consequently, we conclude that

(Plaintiffs' Opposition Memorandum, at 47). Given his opposition to the termination, it would be impossible for Mr. Rediehs to have a "unity of purpose or common design and understanding, or a meeting of the minds" in the decision that is necessary to become a co-conspirator under § 1. *Copperweld,* 467 U.S. at 771, 104 S.Ct. at 2742.[25] Thus, plaintiffs cannot establish concerted action by pointing to Mr. Redieh's attendance at the January 4 meeting.

Plaintiffs have presented no evidence, besides mere speculation,[26] that Matthews, Van Heel, Rediehs or Bryan were seeking to terminate the Siegel contract for any reason aside from the fulfillment of their duties to their respective employers.[27] As the Third Circuit has stated, the party resisting the motion for summary judgment is required to identify specifically the evidence of record which supports the claim and upon which a verdict in its favor may be based. *Childers v. Joseph,* 842 F.2d 689 (3d Cir.1988). Indeed, the evidence we do have suggests the opposite—that Rediehs opposed the termination decision and that the decision went against his own personal choices. Because plaintiffs have produced no evidence that Matthews, Van Heel, Rediehs or Bryan were actually acting in their own interests and against the interests of Carrier Express, we are obligated to grant summary judgment.

### 3. Post–Termination Refusals to Deal

In their attempt to demonstrate concerted action with respect to defendants' alleged refusal to deal, plaintiffs have only made allegations against officers, employees, and agents of Bethlehem and its subsidiaries.

---

Mr. Bryan was no more capable of engaging in an antitrust conspiracy than was Mr. Rediehs.

25. This fact distinguishes our case from the Third Circuit's ruling in *Tunis Brothers Co. v. Ford Motor Co., supra.* In *Tunis Brothers,* the Third Circuit reviewed two tenets of antitrust jurisprudence which are relevant to our agent-principal conspiracy analysis. First, the court stated that questions of motive and intent are normally inappropriate for summary adjudication. *Tunis Brothers Co. v. Ford Motor Co., supra,* 763 F.2d at 1496. Second, the court noted the well-established tenet that "a conspiracy between corporations might arise if the directors, officers, representatives or other employees are working for two or more entities." *Tunis Brothers Co. v. Ford Motor Co., supra,* 763 F.2d at 1497. In *Tunis Brothers,* the Third Circuit found summary judgment inappropriate where the plaintiff alleged that two management employees, Fraher and Hasel, who simultaneously worked for both Ford Motor and a Ford franchise, conspired to terminate a second Ford Franchise which competed with the first. The court noted that there was evidence of unfair and prejudicial treatment of the second franchisee by Fraher and Hasel. In addition, the court pointed out that Fraher and Hasel were the ones who actually made the decision to terminate the second franchisee. Finally, Fraher and Hasel obviously supported the decision to terminate the second franchisee. The court concluded that a trial was necessary to determine if Fraher and Hasel were motivated by their personal interests in the termination of the second franchisee. It is true that in our case Mr. Rediehs was an employee of both Oak Management and Rediehs Express. And plaintiffs allege that Rediehs Express stood to gain if Siegel Transfer were terminated by Carrier Express. (Plaintiffs' Opposition

Memorandum, at 55). The undisputed evidence demonstrates, however, that Mr. Matthews made the termination decision, not Mr. Rediehs. More importantly, Mr. Rediehs *opposed the termination decision.* Since Mr. Redieh's position with respect to the Siegel contract termination is not in question, we are left with no question as to his motives and *Tunis Brothers* is clearly distinguishable on its facts.

26. In their Opposition Memorandum, plaintiffs point to such irrelevant issues as the 1987 strategic plan for Bethtran, where the meeting took place at which Mr. Siegel was advised of the termination, and whether the Bethtran Board had to be involved. (Plaintiffs' Opposition Memorandum, at 14–22). These issues are not relevant to the determination of whether the termination decision was made and implemented by Bethlehem and its subsidiaries, employees and agents, or whether a separate economic actor was involved.

27. In fact, plaintiffs admit that the decision to terminate the Siegel Transfer contract was beneficial to Bethlehem Steel, Carrier Express, and Oak Management. Plaintiffs' Opposition Memorandum, at 18–19, 55 ("the potential beneficiaries of the termination of the ... contract include all the participants"; "Carrier Express will benefit if Siegel Transfer can be replaced"; "Carrier Express will receive a financial benefit"). Plaintiffs have conceded the essential issue—that, the termination decision was within the interests of Bethlehem Steel, Carrier Express, Oak Management. Because the four men were acting in furtherance of the interests of Bethlehem Steel and its subsidiaries and agents, plaintiffs may not rely on the *Copperweld* exception described above.

Our earlier analysis applies equally well to these refusal to deal claims.

■ As the Third Circuit held in *Weiss*, actions by commonly owned companies in deciding with whom to do business cannot constitute a concerted refusal to deal in violation of section 1 of the Sherman Act. *Weiss v. York Hospital, supra,* 745 F.2d at 819 n. 57. Plaintiffs refusal to deal claim is based on nothing more than the alleged refusal of Bethlehem and Carrier Express to do business with Siegel Transfer following the termination of the contract.[28] The only people plaintiffs point to in their Opposition Memorandum are either (1) employees of Oak Management carrying out Carrier Express's instruction not to load Siegel Transfer trucks with Carrier Express freight following the contract termination, or (2) Bethlehem employees who allegedly stated that they would not use Siegel equipment to haul Bethlehem Steel freight. (Plaintiffs' Opposition Memorandum, at 23, 56). We have already held that the conduct of Bethlehem's employees and its subsidiary's agents cannot constitute concerted action.

■ For example, plaintiffs point to evidence that Mr. Larry Rogers, a Bethlehem Steel Transportation Manager at the Company's Johnstown, Pennsylvania plant, told Mr. Steve Everette, an agent for various motor carriers used by Mr. Rogers to transport Bethlehem products, not to use Siegel equipment to haul Bethlehem freight from its rod mills and expressed concern about Siegel's safety record. (Plaintiffs' Exhibit 22, at ¶ 26). Following the termination of the Siegel contract, it obviously became necessary for Bethlehem and Carrier Express employees to tell its agents not to use Siegel trucks to transport freight for Carrier Express. As defendants argue, there would not be much

purpose or effect in terminating the contract with Siegel Transfer if Carrier Express could not tell its own agents, the individuals who actually place Carrier Express freight with motor carriers, about the termination. This simply constitutes unilateral and independent action by a company deciding with whom it will do business. *Monsanto Co. v. Spray-Rite Service Corp., supra,* 465 U.S. at 761, 104 S.Ct. at 1469. *See also International Logistics Group v. Chrysler Corp.,* 884 F.2d 904, 907 (6th Cir.1989), *cert. denied,* 494 U.S. 1066, 110 S.Ct. 1783, 108 L.Ed.2d 784 (1990) (no section 1 conspiracy where company acts unilaterally in formulating and implementing its own marketing policy, even if dealer or distributor involuntarily complies with that policy in order to continue doing business with that company). Therefore, plaintiffs' boycott claims are fatally defective for the same reasons we detailed above.

### 4. *Other Antitrust Claims*

Plaintiffs remaining antitrust claims suffer from the same defect—they concern unilateral conduct only. The "five percent rebate" claim and the "transportation law" claims cannot survive as antitrust claims because plaintiffs have presented no evidence of concerted action. These claims involve the contractual relationship between a parent corporation and its subsidiaries. As we have already detailed, contractual relations within commonly controlled corporations do not raise section 1 Sherman Act concerns. Similarly, plaintiffs' "control" claim defies logic. Plaintiffs' claim that a parent corporation's "control" of its subsidiary is somehow violative of section 1 is absurd—as we have detailed above, a parent corporation and its subsidiary are considered a single entity for the purposes of section 1.[29]

---

**28.** Not only are plaintiffs unable to demonstrate concerted action with regard to their boycott claim, it also appears that plaintiffs' boycott claim is unsupported by the facts. It is undisputed that following the termination of the Siegel Transfer contract, plaintiffs continued to transport Bethlehem Steel freight, as before, through their contracts with other motor carriers who did have direct business relationships with Bethlehem. Defs.Exhibit F (R. Siegel Dep. 11/9/93) at 130–132, 134–136, 141–144; Defs.Exhibit P,

Pls.Answer to Defs.Interrogatory No. 51—Set No. 1.

**29.** By labelling defendants' alleged antitrust violations as "per se" violations, plaintiffs seem to suggest that they may bypass the question of concerted action. *See* Plaintiffs' Opposition Memorandum, at 45–46. But, as the Supreme Court in *Copperweld* made clear, section 1 does not reach unilateral conduct. Thus, whatever the form of the inquiry, i.e. rule of reason or per

Furthermore, even if plaintiffs can establish a violation of the Interstate Commerce Act by virtue of their "transportation law claims," [30] such a violation would not thereby constitute a section 1 Sherman Act claim. "Conduct not within the scope of the [Sherman] Act is not made into an antitrust violation by accompanying conduct which is ... illegal under some other law." *Sitkin Smelting & Refining Co. v. FMC Corp.*, 575 F.2d 440, 447 (3d Cir.1978), *cert. denied,* 439 U.S. 866, 99 S.Ct. 191, 58 L.Ed.2d 176 (1978).

Thus, for all of these reasons, we will grant defendants motion for summary judgment as to Count I of Plaintiffs' Amended Complaint.

## B. *Transportation Law Claims*

In Count XI of their Amended Complaint, plaintiffs state various "civil conspiracy" and "transportation law" claims. Plaintiffs allege that aspects of the contractual relationship between Bethlehem Steel and Carrier Express were violative of the Interstate Commerce Act, 49 U.S.C. § 10761 *et seq.*, and the regulations adopted pursuant thereto. Specifically, plaintiffs first allege that the ten percent commission received by Carrier Ex-

press from Bethlehem was an improper rebate pursuant to 49 U.S.C. §§ 10741(a), 10749, 10761, 10762 and 11901 and the regulations of the ICC (Amended Complaint, ¶ 92). Second, plaintiffs allege that the five percent rebate for all shipments by Bethlehem Steel carried by the Plaintiffs was illegal under 49 U.S.C. §§ 10741(a), 10749, 10761, 10762 and 11901 and the regulations of the ICC, as well as the Elkins Act 49 U.S.C. §§ 11902, 11903 and 11915 (Amended Complaint, ¶ 93). Third, plaintiffs argue that the ownership and control arrangement between Bethlehem Steel, PB & NE Railroad, Bethtran and Carrier Express is illegal.[31] Defendants move to dismiss Count XI for plaintiffs' failure to state a claim pursuant to Fed. R.Civ.Proc. 12(b)(1) and 12(b)(6).

■ A private federal remedy for violating a federal statute is a prerequisite for finding federal question subject matter jurisdiction. As the Supreme Court stated in *Merrell Dow Pharmaceuticals Inc. v. Thompson*, 478 U.S. 804, 106 S.Ct. 3229, 92 L.Ed.2d 650 (1986):

a complaint alleging a violation of a federal statute as an element of a state cause of

se analysis, section 1 claimants must first demonstrate concerted action.

In addition, plaintiffs' claims are not saved by their invocation of the *Pick–Barth* doctrine. The doctrine condemns as a *per se* violation a conspiracy intended to eliminate a competitor by unfair means. *Albert Pick–Barth Co. v. Mitchell Woodbury Corp.*, 57 F.2d 96, 102 (1st Cir.), *cert. denied* 286 U.S. 552, 52 S.Ct. 503, 76 L.Ed. 1288 (1932). Courts which have utilized the doctrine have continued to require proof of a conspiracy; thus, plaintiffs inability to demonstrate concerted action makes the doctrine inapplicable here. *See e.g. Robinson v. Magovern*, 521 F.Supp. 842, 913–914 (W.D.Pa.1981), *aff'd*, 688 F.2d 824 (3d Cir. 1982), *cert. denied*, 459 U.S. 971, 103 S.Ct. 302, 74 L.Ed.2d 283 (1982). Furthermore, the doctrine itself has been rejected by a majority of recent decisions, including a decision by the First Circuit which originally promulgated the doctrine. *See e.g. Military Servs. Realty Inc. v. Realty Consultants of Virginia Ltd,* 823 F.2d 829, 831 (4th Cir.1987); *Havoco of America, Ltd. v. Shell Oil Company,* 626 F.2d 549, 555–556 (7th Cir. 1980); *George R. Whitten, Jr. v. Paddock Pool Bldrs.,* 508 F.2d 547, 561–62 (1st Cir.1974), *cert. denied,* 421 U.S. 1004, 95 S.Ct. 2407, 44 L.Ed.2d 673 (1975).

**30.** While we dismiss plaintiffs' transportation law claims because the Interstate Commerce Act does not afford a private party a remedy in

federal court for such claims, *see* our discussion of the "transportation law" claims in Section B, *infra,* we do not pass judgment on whether any behavior on the part of the defendants was violative of the provisions and regulations of the Act.

**31.** Plaintiffs include this third claim, the so-called "control claim," in Count XI of their Amended Complaint (entitled "Transportation Law" claims) at paragraph 94. Plaintiffs cite no sections of the Interstate Commerce Act in paragraph 94. Plaintiffs admit that plaintiffs' control claim in paragraph 94 "is an antitrust claim, which includes, as part of the claim, defendants' violation of the Interstate Commerce Act and the regulations of the ICC." Answer and Memorandum of Plaintiffs in Opposition to Defendants' Motion to Dismiss, at 12; *see also* Answer and Memorandum of Plaintiffs in Opposition to Defendants' Motion for Summary Judgment, at 92. As we have already granted summary judgment on plaintiffs' antitrust claims due to plaintiffs' inability to present evidence of concerted action, and since paragraph 94 of Plaintiffs' Amended Complaint offers no additional evidence of concerted action, we grant summary judgment with respect to any antitrust claims contained in paragraph 94 of Plaintiffs' Amended Complaint.

action, when Congress has determined that there should be no private, federal cause of action for the violation, does not state a claim "arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331.

*Id.,* 478 U.S. at 817, 106 S.Ct. at 3237; *see also Smith v. Industrial Valley Title Ins. Co.,* 957 F.2d 90, 93 (3d Cir.1992), *cert. denied,* —— U.S. ——, 112 S.Ct. 3034, 120 L.Ed.2d 903 (1992) ("a private federal remedy for violating a federal statute is a prerequisite for finding federal question jurisdiction.") Plaintiffs bring their claims under the Interstate Commerce Act and, therefore, it must be determined whether plaintiffs are entitled to a private federal remedy under the Act.

■■■ With its creation of the Interstate Commerce Commission, Congress created an administrative agency charged with the primary responsibility for the investigation, regulation, adjudication and enforcement of controversies arising under the Interstate Commerce Act. *F.P. Corp. v. Ken Way Transportation, Inc.,* 821 F.Supp. 1032, 1036 (E.D.Pa.1993). In most instances, a private party is required by the Act to petition the ICC to enforce any alleged violations of the Act. *See e.g.* 49 U.S.C. § 11701(b). In addition, both civil and criminal penalties for violations of the Act are generally paid to the United States Government. *See e.g.* 49 U.S.C. § 11902, 11903 (civil and criminal penalties for accepting rebates from common carriers and rate discrimination are paid to the United States Government).

There are a few limited sections of the Interstate Commerce Act that do indeed permit a private party to seek a remedy in federal court. *See Vosch v. Werner Continental, Inc.,* 734 F.2d 149 (3d Cir.1984), *cert. denied* 469 U.S. 1108, 105 S.Ct. 784, 83

L.Ed.2d 779 (1985) (holding that section 11708(a) of the Act provides the only basis for private enforcement of the Act). These sections, however, are neither relied upon by the plaintiffs and, more importantly, are inapplicable to this case. These sections include 49 U.S.C. §§ 11704, 11705(b)(1) & (2), 11707 and 11708. Section 11704 permits a private party to bring a suit to prevent abandonment of freight forwarder service, a situation inapplicable here. Section 11708 is limited to clear violations of certain provisions of the Act that regulate carriers' operating certificates and permits, issues which are not present here.

Sections 11705 and 11707 both permit private suits against common carriers. However, plaintiffs have conceded that when operating as a carrier, Carrier Express was operating at all relevant times as a contract carrier. (Plaintiffs' Reply Memorandum in Support of Plaintiffs' Motion to Amend Complaint, at 12.) They have similarly conceded that Siegel Transfer acted as a motor contract carrier. (Answer and Memorandum of Plaintiffs in Opposition to Defendants' Motion to Dismiss, at 9.) Since there are no allegations regarding common carriers in this case, sections 11705 and 11707 are inapplicable here.[32]

The only other area of private actions permitted under the Act involve so-called "undercharge" claims. In a typical undercharge case, a common carrier negotiates with a shipper for a lower rate than the tariff that the common carrier is required to file with the ICC. After the common carrier receives payment for the shipments, it sues the shipper under the so-called "filed rate doctrine" for the difference between the filed tariff rate and the negotiated rate. *See e.g., Maislin Industries, U.S. v. Primary Steel,* 497

---

**32.** A motor carrier must satisfy two requirements to be considered a contract carrier: the agreements must meet the "distinct needs" of the shipper and the agreements must be "continuing." *Dan Barclay, Inc. v. Stewart & Stevenson Services Inc.,* 761 F.Supp. 194, 200 (D.Mass. 1991). As both plaintiffs and defendants agree that both Siegel Transfer and Carrier Express acted as contract carriers in their capacity as carriers of Bethlehem Steel shipments, we need not engage in an analysis of either the "distinct needs" or "continuing agreement" requirements. *See F.P. Corp. v. Ken Way Transp., Inc., supra,* 821 F.Supp. at 1035. Nor do we see any need to refer this question to the ICC for resolution pursuant to the doctrine of primary jurisdiction, because there appears to be no dispute. *Id.,* 821 F.Supp. at 1035, 1036. We are satisfied that plaintiffs and defendants are correct in their characterization of Siegel Transfer and Carrier Express as contract carriers.

U.S. 116, 120, 110 S.Ct. 2759, 2762–63, 111 L.Ed.2d 94 (1990).

As stated above, a common carrier may only charge the rate that is contained in the tariff it files with the ICC. 49 U.S.C. § 10761. This rule forms the basis for the "filed rate doctrine." Since 1983, contract carriers have been exempt from the rate filing and uniform rate requirements of the Interstate Commerce Act.[33] *Exemption of Motor Contract Carriers from Tariff Filing Requirements*, Ex Parte No. MC–165, 133 M.C.C. 150 (1983), *aff'd, Central and Southern Motor Freight Tariff Association, Inc. v. United States*, 757 F.2d 301, 305–306, 322–330 (D.C.Cir.), *cert. denied*, 474 U.S. 1019, 106 S.Ct. 568, 88 L.Ed.2d 553 (1985). Thus, the undercharge theory necessarily involves only common carriers, not contract carriers.[34] Once again, there is no allegation that any of the parties in this case was a common carrier. Consequently, the undercharge line of cases are inapplicable here.[35]

While conceding that Siegel Transfer and Carrier Express were contract carriers at all relevant times, plaintiffs argue that Carrier Express was a "broker" and was prohibited by ICC regulation (45 CFR 1045.9) from receiving a "commission" or paying a "rebate." Plaintiffs argue that undercharge claims may be brought against brokers who violate the regulations of the ICC. *See* Memorandum of Plaintiffs in Opposition to Defendants' Motion to Dismiss, at 8–9. Once

again, plaintiffs seem to misunderstand the nature of an undercharge claim. An undercharge claim must involve a common carrier subject to the filing and uniform rate requirements of the Interstate Commerce Act. While brokers may or may not be liable in such cases,[36] post–1983 undercharge cases always involve common carriers, an element glaringly absent in this case. *See e.g. Reiter v. Cooper*, —— U.S. ——, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993); *F.P. Corp. v. Ken Way Transportation, Inc., supra; Atlantis Express, Inc. v. Standard Transportation Services, Inc.*, 955 F.2d 529 (8th Cir.1992).

Plaintiffs cite no other sections of the Interstate Commerce Act which provide for private enforcement. Instead, they simply restate those sections of the Interstate Commerce Act and the ICC regulations which they claim were violated by defendants. The only sections cited by plaintiffs in their Amended Complaint are sections 10741(a), 10749, 10761, 10762, and 11901 and the Elkins Act, 49 U.S.C. §§ 11902, 11903 and 11915. None of these sections contains an enforcement provision permitting a private litigant to bring an action in federal court to remedy an alleged violation of the section. *See e.g. Bloomer Shprs Ass'n v. Ill. Cent. Gulf R. Co.*, 655 F.2d 772 (7th Cir.1981) (no private right of action under the Elkins Act).[37] In fact, these sections contain no enforcement provisions at all.

---

**33.** The ICC exempted contract carriers pursuant to its statutory authority as stated in 49 U.S.C. § 10761(b): the "Commission may grant relief from [the filed tariff requirements] to contract carriers when relief is consistent with the public interest and the transportation policy ..."

**34.** Plaintiffs cite numerous undercharge cases brought by contract carriers. *See e.g. Nyad Motor Freight, Inc. v. W.T. Grant Co.*, 350 F.Supp. 692 (S.D.N.Y.1972); *Siegel v. Converters Transportation, Inc.*, 714 F.2d 213 (2nd Cir.1983); and *A & F Trucking Corp. v. Liggett Drug Co.*, 253 F.Supp. 699 (S.D.N.Y.1966). These cases all pre-date the ICC's exclusion of contract carriers, and therefore these cases were brought at a time when the Act contained a requirement that contract carriers file their contract rate with the ICC and adhere to that rate. As such, these cases are clearly distinguishable and are of questionable validity under current law.

**35.** Plaintiffs originally conceded that they cannot maintain an action based on the undercharge

theory. "Therefore, it is not the undercharge that is at issue." Plaintiffs' Memorandum in Support of Plaintiffs' Motion to Amend Complaint, at 12. In response to Defendants' current motion to dismiss, however, plaintiffs now attempt to cite the very undercharge cases which they repudiated in earlier pleadings. *See* Memorandum of Plaintiffs in Opposition to Defendants' Motion to Dismiss, at 8–9. This inconsistency is indicative of the spurious nature of plaintiffs' "transportation law" claims.

**36.** The issue of broker liability for undercharges is unsettled. *See Atlantis Express v. Standard Transportation Services, Inc.*, 955 F.2d 529, 534 (8th Cir.1992).

**37.** In *American Telephone and Telegraph v. M/V Cape Fear*, 967 F.2d 864 (3d Cir.1992), the Third Circuit expressed its approval of the Seventh Circuit's rationale in *Bloomer Shippers Ass'n*. In particular, the court cited the following language from *Bloomer Shippers Ass'n*: "In short, a plain-

Even if plaintiffs did identify conduct on the part of the defendants which would constitute a violation of the Interstate Commerce Act and the relevant ICC regulations, we would not pass judgment on the legality of defendants actions under these laws. Such a determination is most properly left to the Interstate Commerce Commission, the expert administrative body charged with investigating and remedying such violations. *See B.F. Goodrich Co. v. Northwest Industries, Inc.,* 424 F.2d 1349, 1355 (3d Cir.1970), *cert. denied* 400 U.S. 822, 91 S.Ct. 41, 27 L.Ed.2d 50 (1970) ("private party injured by a violation of the [Interstate Commerce] Act must seek remedial relief from the [Interstate Commerce] Commission.") We hold, therefore, that plaintiffs have brought their grievances before the wrong forum because they lack a private cause of action under the Interstate Commerce Act to complain of such conduct in federal court.

## C. State Law Claims

### 1. Maryland Anti–Trust Act

■■■ Defendants have moved for summary judgment with respect to Count II of Plaintiffs' Amended Complaint, which has been brought under the Maryland Anti–Trust Act, Md.Comm.Law.Code Ann. § 11–204(a)(1) (1990). The Maryland Anti–Trust Act was designed to complement the federal antitrust laws. Section 11–202(a) of the Act states that, in construing the Act, "the courts [are to] be guided by the interpretation given by the federal courts to the various federal statutes dealing with the same or similar matters."

Section 11–204(a)(1) of the Maryland Act is essentially the same as Section 1 of the Sherman Act. "Thus, the decisions of the federal courts interpreting Section 1 of the Sherman Act guide us here." *Natural Design, Inc. v. Rouse Company,* 302 Md. 47, 53, 485 A.2d 663, 666 (1984) (applying the *Copperweld* doctrine in determining whether conspiracy to violate Section 11–204(a)(1) of the Maryland Act has been adequately demonstrated).

We have already determined that plaintiffs cannot demonstrate concerted action and, as a result, defendants are entitled to summary judgment with respect to plaintiffs' federal antitrust claims. Because plaintiffs' claims under the Maryland Act are duplicative of their Section 1 claims under the federal antitrust laws, summary judgment must likewise be granted in favor of defendants as to Count 2 of Plaintiffs' Amended Complaint. *See Purity Products, Inc. v. Tropicana Products, Inc.,* 702 F.Supp. 564, 574 (D.Md.1988), *aff'd,* 887 F.2d 1081 (4th Cir.1989) (dismissing duplicative Maryland antitrust claim where federal claim failed).

### 2. Breach of Contract

In Counts III and IV of their Amended Complaint, plaintiffs allege that defendants Carrier Express and Bethtran breached the Siegel Transfer/Carrier Express contract. The issue presented by plaintiffs' breach of contract claim is whether, as defendants contend, Carrier Express and Bethtran were entitled, pursuant to ¶ 13 of the contract (hereinafter the "termination clause") to terminate the contract. Both plaintiffs and defendants agree that the interpretation of the Siegel Transfer/Carrier Express contract is a question of law rather than of fact and is for the Court, rather than a jury, to decide. (Memorandum in Support of Defendant's Motion for Summary Judgment, at 18; Plaintiffs' Opposition Memorandum at 3). We conclude that, as a matter of law, the clear and unambiguous language of the contract demonstrates that defendants were justified in terminating the contract and, therefore, that they did not breach the contract.

■■■ To begin with, both parties have analyzed the breach of contract issue under the assumption that Maryland law governs the construction of the contract. (Memorandum in Support of Defendants' Motion for Summary Judgment, at 20 n. 59; Plaintiffs' Amended Complaint, ¶ 25). As we have diversity jurisdiction over this state law

tiff must find a private remedy elsewhere in the Act (e.g., [in statutes expressly providing a civil cause of action]) before invoking the protection of the

language in Section 43." *American Telephone and Telegraph,* 967 F.2d at 868, *citing Bloomer Shippers Association,* 655 F.2d at 778.

claim,[38] we apply Pennsylvania's (the forum state's) choice of law rule. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Pennsylvania's rule requires examination of the significant contacts as they relate to the states' public policies underlying the issue in question. *General Star National Insurance Co. v. Liberty Mutual Insurance*, 960 F.2d 377, 379 (3d Cir.1992); *Melville v. American Home Assurance Co.*, 584 F.2d 1306, 1312–15 (3d Cir.1978) (predicting Pennsylvania would apply the combination of significant contacts and interest analysis to contract actions). Since the contract was prepared and executed in Maryland, and plaintiffs are all incorporated and/or have their principal places of business in Maryland, (Plaintiffs' Amended Complaint, ¶¶ 7–9, 25), we agree with the approach taken by plaintiffs and defendants and we will interpret the contract utilizing Maryland law. Nonetheless, we are confident that our conclusion would be the same under the law of Pennsylvania.[39]

Maryland courts employ the so-called "objective test" when interpreting contracts. The written language of a contract governs "the rights and liabilities of the parties, irrespective of the intent of the parties at the time they entered into the contract, unless the written language is not susceptible of a clear and definite understanding." *Pantazes v. Pantazes*, 77 Md.App. 712, 551 A.2d 916, 919 (Md.Ct.Spec.App.1989), *cert. denied* 315 Md. 692, 556 A.2d 673 (1989); *Kasten Construction Co. v. Rod Enterprises, Inc.*, 268 Md. 318, 301 A.2d 12, 17–18 (1973) (true test of what is meant in a contract is what "a reasonable person in the position of the parties would have thought it meant").

Paragraph 13 of the contract defines the duration of the agreement as well as the procedure for renewal and termination. It reads as follows:

> This AGREEMENT is to become effective January 4, 1986 and shall remain in effect for a period of three yrs from such date, and from year to year thereafter, subject to the right of either party hereto to cancel or terminate the AGREEMENT at any time upon not less than thirty (30) days written notice of one party to the other.

(Defs.Exhibit B, The Contract, at ¶ 13). It is undisputed that Carrier Express gave Siegel Transfer written notice of the termination of the contract on January 4, 1990. It is also undisputed that between January 4 and January 12, 1990, Carrier Express gave Siegel Transfer over 600,000 pounds of freight to transport under the contract which was more than the annual contract minimum amount. (Defs.Exhibit L, Request for Admission No. 16). Finally, plaintiffs admit that Carrier Express had the contractual right to terminate the contract "for any reason and for no reason." (Defs.Ex.L, Pls.Response to Defs.Request for Admission No. 13—Set No. 1).

Despite these concessions, plaintiffs nonetheless urge that the contract renewed for the year ending on January 4, 1991. Plaintiffs assert that defendants' January 4, 1990 notice was ineffective. They argue that in order for the defendants to have properly terminated the contract pursuant to paragraph 13, defendants were obligated to give notice on or before December 4, 1989. In other words, plaintiffs read the thirty days written notice clause to require the terminating party to give thirty days notice prior to the automatic yearly renewal which occurs on January 4 of each year. Furthermore, plaintiffs believe that once the contract renews for a period of one year, neither party may

---

**38.** As noted above, we have both diversity and federal question jurisdiction in this matter. As we will dismiss all federal claims, we retain diversity jurisdiction over plaintiffs' state law claims pursuant to 28 U.S.C. § 1332.

**39.** When Pennsylvania courts analyze contracts, the paramount consideration is the intent of the parties. *Hutchison v. Sunbeam Coal Corp.*, 513 Pa. 192, 519 A.2d 385, 389 (1986). "The intent of the parties is ascertained from the document itself when the terms are clear and unambiguous." *Id.*, at 390. Only where an ambiguity exists will the courts look to parol evidence regarding the intent of the parties to clarify contract language. When the contract terms are easily understood, the court interprets the contract. *Polish American Machinery Corp. v. R.D. & D. Corp.*, 760 F.2d 507 (3d Cir.1985). Since we find that the contract in this case is clear and unambiguous, an analysis under Pennsylvania law would yield the same result as our analysis under Maryland law.

terminate the contract until the end of that year.

Defendants argue that the plain and unambiguous language of the contract permits either party to terminate the contract "at any time" subject to the thirty days notice requirement. Defendants assert that such notice was given here and that the contract expired thirty days after the notice. They assert that plaintiffs' reading of the contract would render the "at any time" language meaningless, and that such a result is incompatible with well-settled principles of contract interpretation. *Rothman v. Silver*, 245 Md. 292, 296, 226 A.2d 308, 310 (1967) (meaning of contract is to be determined by giving effect to all its provisions, if it is possible to do so).

We agree with defendants that plaintiffs' reading of the contract is strained at best and that it would render the "at any time" language meaningless. What's more, plaintiffs' assertion that the thirty day notice period lasts between December 4 and January 4 is an insupportable construction of the contract language—if the parties had intended to create such a notice period, they would have appended the notice provision to the year to year renewal language. In sum, plaintiffs' interpretation reads out of the contract the important qualifying provision that either party could terminate the contract *at any time.*

It is apparent that at the time of Carrier Express's notice of termination, the original three year contract term had expired and the contract was renewed pursuant to the "year to year" provision. Defendants were obviously within their rights, however, to cancel the contract at any point during the year ending January 4, 1991 subject to the thirty day notice requirement. Defendants provided such notice, and the contract expired 30 days later. Following the termination notice, defendants provided freight transport business which satisfied its obligation for the year ending January 4, 1991. Thus, defendants did not breach the contract. The language of the contract is clear and subject to no other reasonable interpretation.

Finally, we note that plaintiffs' breach of contract claim fails for an additional reason. It is undisputed that Carrier Express gave Siegel Transfer more than the contract annual minimum amount of freight to transport on and after the January 4, 1990 termination date. Thus, even if defendants notice of termination was somehow ineffective, defendants met their freight obligations for the year ending January 4, 1991. Plaintiffs argue that this amount only constituted a contract minimum and did not approach the potential freight capacity of Siegel Transfer. Just as they do in their claims for breach of an implied duty of good faith, plaintiffs are attempting to read obligations and duties into the contract which the plain language of the contract does not require (*see* Section III(C)(4), *infra.* The law does not create such burdens when the language of the contract is explicit. *See Parker v. Columbia Bank*, 91 Md.App. 346, 604 A.2d 521, 531 (1992), *cert. denied*, 327 Md. 524, 610 A.2d 796 (1992). Thus, we will grant summary judgment in favor of defendants on plaintiffs' breach of contract claims.

### 3. *Promissory Estoppel*

Plaintiffs' promissory estoppel claim is based on alleged promises and representations made by Bethlehem agents to the effect that Siegel Transfer would continue to do business with Bethlehem subsequent to the termination of the contract, and for a reasonable period thereafter. Plaintiffs claim that when Russ Siegel attended a meeting in November, 1985 concerning the formation of Bethtran, he was told by an unidentified Bethlehem agent that after the termination of the contract he would continue to do business with Bethlehem Steel. Plaintiffs also allege that during the life of the contract, on more than one occasion, James Matthews made similar assurances. (Plaintiffs' Opposition Memorandum, at 40).

Plaintiffs further allege that based upon these oral promises, Mr. Siegel increased his truck fleet by approximately fifty percent and also increased his trailer fleet, for a total expenditure of roughly $3.6 million. (Pls.Ex. 1, Siegel Affidavit, ¶¶ 17–18). Defendants should be estopped, plaintiffs argue, from "denying that they induced the plaintiffs to make the capital investment they made

based upon the promise that the business relationship would continue after the termination of the Carrier Express/Siegel Transfer Contract." (Plaintiffs' Opposition Memorandum, at 44–45).

█ In this diversity action alleging promissory estoppel, Pennsylvania law applies because Pennsylvania is the place where the promise was allegedly made and where it was to be performed. *Universal Computer Systems, Inc. v. Medical Services Ass'n,* 628 F.2d 820, 823 (3d Cir.1980).[40] Pennsylvania law recognizes promissory estoppel claims. *See Central Storage & Transfer Co. v. Kaplan,* 487 Pa. 485, 489, 410 A.2d 292, 294 (1979) (doctrine of promissory estoppel embodied in section 90 of the Restatement (Second) of Contracts is the law of Pennsylvania).

█ The elements of the claim based on promissory estoppel are: (1) a promise to a promisee, (2) which the promisor should reasonably expect will induce action by the promisee, (3) which does induce such action, and (4) which should be enforced to prevent injustice to the promisee. *C & K Petroleum Products, Inc. v. Equibank,* 839 F.2d 188, 192 (3d Cir.1988); *Restatement (Second) of Contracts,* § 90 (1981).

█ In support of their motion for summary judgment, defendants argue that the alleged promises made by Bethlehem employees are not of the kind on which a reasonable business person would rely to purchase additional trucks and incur substantial debt. Defendants urge that these statements lack specificity concerning the volume of business, what plants Siegel would serve, how many trucks would be needed, or whether Siegel Transfer would get business if the contract was terminated for safety reasons.

While it is true that actions for detrimental reliance may not be based on broad and vague implied promises, *see e.g. C & K Petroleum Products, Inc. v. Equibank, supra,* 839 F.2d at 192, we believe a genuine issues of material fact remain with respect to numerous factual issues, including: (1) what exactly

was promised to Mr. Siegel with respect to a continued volume of business; (2) who made such promises and with what authority; (3) did Mr. Siegel in fact rely on these promises in making these capital expenditures, or were the expenditures made for other reasons; (4) was Mr. Siegel's reliance on these statements commercially reasonable. Given the existence of these fact-bound questions, we must deny defendants' motion for summary judgment with respect to Count VI of plaintiffs' Amended Complaint.

### 4. *Implied Covenant of Good Faith*

█ Counts VII and VIII of plaintiffs' Amended Complaint state claims for breach of an implied duty of good faith on the part of defendants Carrier Express and Bethtran. Plaintiffs argue that the timing of the termination of the contract and the manner of the termination failed to conform to a standard of good faith dealing. For example, plaintiffs claim that they suffered injury because they lacked adequate notice of defendants' intention to terminate the contract and because of the abrupt nature of the termination.

Plaintiffs' claim must fail because, as discussed in Section III(C)(2), *infra,* the express and unambiguous language of the contract allowed for termination as long as the canceling party gave thirty days written notice. Such notice was given in this case. Plaintiffs are seeking to use an implied duty to add terms to the contract and override an express contract term. They seek to do so, in spite of their concession that the "implied covenant of good faith and fair dealing does not override an explicit contract term." (Plaintiffs' Opposition Memorandum, at 39).

While an implied duty of good faith is a contractual duty, it does not change the terms of the contract or require a party to take affirmative actions that it is clearly not required to take under the contract. *See Parker v. Columbia Bank, supra.* Since defendants acted in conformity with the explicit dictates of the termination clause of the contract, they cannot be found to have violated an implied term requiring more than thirty

---

**40.** Both parties agree that Pennsylvania law applies to plaintiffs' promissory estoppel claim because the alleged promise was made in Pennsylvania. *See* (Memorandum in Support of Motion for Summary Judgment, at 25 n. 63); (Plaintiffs' Opposition Memorandum, at 41).

days notice prior to termination. The implied duty of good faith does not change the terms of the contract. Therefore, there is no room for us to further construe the document. *See General Motors Acceptance Corp. v. Daniels,* 303 Md. 254, 261, 492 A.2d 1306 (1985) ("[T]he clear and unambiguous language of an agreement will not give way to what the parties thought that the agreement meant or intended it to mean.") Accordingly, we grant defendants' motion for summary judgment with respect to Counts VII and VIII of plaintiffs' Amended Complaint.

### 5. *Civil Law Conspiracy*

In Count XI of their Amended Complaint, plaintiffs assert civil conspiracy and "transportation law" claims. They claim that defendants conspired illegally to terminate the Siegel contract and to prohibit plaintiffs from transporting Bethlehem steel products. The illegality of defendants' actions is premised upon alleged violations of the Interstate Commerce Act. In Section III(B), *infra,* we explained why plaintiffs lack a private cause of action under federal law to bring their Interstate Commerce Act claims in this court. It appears that plaintiffs do not have a separate state law conspiracy claim aside from a claim premised on alleged violations of the Interstate Commerce Act.

 Civil conspiracy is a state common law claim which requires proof of, among other things, a combination or agreement between two or more persons to do an unlawful and an overt act which causes legal damage to the plaintiff. *Thompson Coal Co. v. Pike Coal Co.,* 488 Pa. 198, 211, 412 A.2d 466, 472 (1979); *Rutherford v. Presbyterian–University,* 417 Pa.Super. 316, 612 A.2d 500 (1992). We have already declined to rule on the legality of defendants' actions under the Interstate Commerce Act. We agree with defendants that plaintiffs cannot circumvent the Interstate Commerce Act's enforcement provisions by labelling their claim as one for civil conspiracy in order to obtain remedies that the statute does not provide.

 But even if Pennsylvania law afforded such a remedy, plaintiffs conspiracy claim must be dismissed. Count XI of plaintiffs' Amended Complaint asserts a civil conspira-

cy claim based solely on an alleged conspiracy among a parent corporation and its subsidiaries (Bethlehem, Bethtran and Carrier Express). It is well-settled that a corporation cannot conspire with its subsidiaries, its agents or its employees for the same reasons the *Copperweld* Court found such a conspiracy to be legally impossible in the antitrust conspiracy context. *See e.g. Michael v. Shiley, Inc.,* 1994 WL 59349, at *15, 1994 U.S.Dist. LEXIS 1973, at *46–47 (E.D.Pa. Feb. 25, 1994) (granting summary judgment to defendants on state law conspiracy claim involving alleged conspiracy between parent and subsidiary); *Glessner v. Kenny,* 952 F.2d 702, 710 (3d Cir.1991); *Rutherford v. Presbyterian–University, supra,* 417 Pa.Super. 316, 612 A.2d 500, at 508–509. Thus, any remaining state conspiracy claim must be dismissed because the parties named as defendants in Count XI are incapable of conspiring with one another as a matter of law.

## IV. Conclusion

For these reasons, we will grant summary Defendants' Motion for Summary Judgment with respect to Plaintiffs' Sherman Act claims contained in Count I of Plaintiffs' Amended Complaint. In addition, we will grant Defendants' Summary Judgment Motion with respect to Plaintiffs' state law claims for violation of the Maryland Anti–Trust Act (Count II), Plaintiffs' Breach of Contract Claims (Counts III and IV), and Plaintiffs' Implied Covenant of Good Faith Claims (Counts VII and VIII). We deny Defendants' Motion for Summary Judgment with respect to Plaintiffs' Promissory Estoppel claims (Count VI).

Finally, we will grant Defendants' Motion to Dismiss Plaintiffs' "Transportation Law" claims contained in Count XI of Plaintiffs' Amended Complaint.

An appropriate order follows.

### *ORDER*

AND NOW, this 1st day of July, 1994, consistent with the foregoing Opinion, it is hereby **ORDERED** that said Opinion and this Order are filed in lieu of our prior

Opinion and Order issued on June 21, 1994 and filed on June 22, 1994.[1]

1. Defendants' Motion for Summary Judgment, filed March 21, 1994, is **GRANTED** with respect to Counts I (Sherman Act), II (Maryland Anti–Trust Act), III (Breach of Contract), IV (Breach of Contract), VII (Implied Covenant of Good Faith), VIII (Implied Covenant of Good Faith), of Plaintiffs' Amended Complaint;

2. Defendants' Motion for Summary Judgment, filed March 21, 1994 is **DENIED** at this time with respect to Count VI (Promissory Estoppel) of Plaintiffs' Amended Complaint;

3. Defendants' Motion to Dismiss Plaintiffs' Transportation Law Claims, filed March 21, 1994, is **GRANTED** with respect to Count XI [2] of Plaintiffs' Amended Complaint;

3. **JUDGMENT IS ENTERED** in favor of **DEFENDANTS** with respect to Counts I, II, III, IV, VII, and VIII of Plaintiffs' Amended Complaint, and also with respect to Plaintiffs' Civil Conspiracy Claim in Count XI; and

4. All federal claims in Count XI of Plaintiffs' Amended Complaint are hereby **DISMISSED WITH PREJUDICE.**

---

1. We vacated our prior Opinion and Order by an Order of June 28, 1994 so that we might address plaintiffs' state law claims.

2. Consistent with the foregoing Opinion, to the extent that plaintiffs have raised a state law conspiracy claim in Count XI, summary judgment is entered in favor of defendants.